Jones, Chief Judge,
delivered the opinion of the court:
The Hospital Bureau of Standards and Supplies, Incorporated, brings this action to recover Federal income taxes paid by it for the calendar years 1952 and 1953. Exemption from such taxes is claimed by the plaintiff under the provisions of section 101 (6) of the Internal Revenue Code of 1939. That portion of section 101 (6) relevant to a determination of the issue here presented provides a tax exemption for “Corporations, * * * organized and operated exclusively for * * * charitable, * * * purposes, * * [1] 'The Government challenges the assertion that plaintiff’s activities were exclusively charitable in nature. It is further argued by the Government that should the plaintiff be designated a charitable organization it has, nevertheless, failed to sustain the burden of proving that it was so organized and operated during the years in question.
The plaintiff was incorporated under the Membership ■Corporations Law of the State of New York in 1934. Since that time, its principal place of business has been in the city of New York. The by-laws of the plaintiff, set forth in finding 4, provide:
Section 1. Any hospital or similar institution not conducted for profit, and engaged in whole or in part in charitable work, is eligible to membership in this Corporation as an institutional member.
Findings 5 and 8 indicate that plaintiff was established as a successor to an organization of a similar name. Twelve directors, each residing at a different hospital, were named in plaintiff’s certificate of incorporation. The certificate also specified that the plaintiff was not organized for “pecuniary profit.”
To implement its express purposes, quoted in finding 5, the plaintiff initiates purchasing, or “jobbing,” arrangements with various suppliers, whereby the member organizations *93 can purchase hospital supplies as a group and thus realize savings not possible under individual purchases. Under this plan the merchandise is shipped directly to the hospitals but the invoices are sent to the plaintiff. To take advantage of discount savings, the plaintiff promptly pays the invoices and later collects from the members which have ordered and received the supplies. Bather than permit release of information as to net prices and thereby create friction between the plaintiff and its suppliers and between the suppliers and their competitors, the plaintiff adopted a policy in 1945 of billing its member hospitals at a higher price than that paid to the suppliers. The excesses resulting from collections from members, known as “patronage refunds,” are credited to them, and they receive a credit memo or check at the end of each quarter.
In addition, the plaintiff maintains a research department to establish uniform standards as to the quality and price of supplies ordinarily used by the member institutions. Laboratory and service tests are conducted which frequently result in improved economy and use of materials. This information is passed along to the member hospitals to be used in selecting the items they customarily purchase. Material on the conservation of hospital equipment is also available to the members. Special technical consultant service is. offered by the plaintiff. In addition to its publications, the plaintiff also maintains contact with its members through field representatives who make personal calls at member hospitals to discuss problems related to the plaintiff’s services.
The plaintiff derives an income from dues paid by its. member institutions, from cash discounts secured through-prompt payment to suppliers, and from a service charge on all “jobbing” items. Income in excess of operating expenses, is retained in a revolving fund for purchases for members. Being a membership corporation, the plaintiff has no capital stock, has no stockholders, and pays no interest or dividends, of any kind. The executive director is the only officer receiving a salary from the plaintiff corporation, and only' those employees who are actually and wholly engaged in the daily operation of the plaintiff are compensated for their *94 services. The membership of the Hospital Bureau of ■Standards and Supplies, Incorporated, consisted of 207 Institutions in the year 1952.
Unquestionably the technical analysis and purchase of •hospital supplies from suppliers are necessary and indispensable to the operations of the plaintiff’s member hospitals. It was with a view to provide this highly specialized service, that the plaintiff was incorporated. We have confirmed in finding 16 that plaintiff’s activities effected savings to its member institutions. Where the taxpayer is engaged in a business enterprise that bears a close and intimate relationship to the functioning of a tax-exempt educational institution, it has been held that the taxpayer is entitled to an exemption as an educational institution within the meaning of section 101 (6) of the Internal Revenue Code of 1939. Squire v. Students Book Corporation, 191 F. 2d 1018. The facts in that case overturn the Government’s argument that the Hospital Bureau of Standards and Supplies, Incorporated, was not an integral part of the operations of its hospital members since “it performed no hospital services.” There the taxpayer was a corporation organized to operate a bookstore and restaurant on the campus of a state college, and whose profits were to be utilized primarily in constructing a student union building which was to become state property. Squire v. Students Book Corporation, supra. The fact that the taxpayer did not render “educational services” was not controlling in that decision. The Tax Court has likewise extended recognition to the view that the activities of a taxpayer need not involve “educational services,” to the extent of providing formal instruction under the supervision of a regular faculty, as the Government’s argument would lead us to believe, in order' to qualify for exemption as an educational institution under the provision of section 101 (6) of the Internal Revenue Code of 1939. Forest Press, I no. v. Commissioner of Internal Revenue, 22 T. C. 265. Furthermore, the fact that the taxpayer claiming an exemption realizes a profit during the taxable year is not sufficient in itself for disallowing the exemption. Forest Press, Inc. v. Commissioner of Interned Revenue, supra.
*95 We question the applicability of Treasury Begulations 111, § 29.101-8 (b), subsequently incorporated as § 39.101-2 (b) of Begulations 118 to a membership corporation where the members are engaged in related charitable activities.[2] Here the plaintiff is composed entirely of member hospitals. Its •services are available only to the member institutions. To ■construe the Begulations as denying exemption in this particular case would require distortion of the language •employed.
Whether the plaintiff loses its exemption as a result of the “feeder organization” amendment of the Bevenue Act of 1950, section 301 (b) involves a question of fact as to whether it was an “organization operated for the primary purpose of carrying on a trade or business for profit” during the years in question.[3] The nature of plaintiff’s activities, essentially involving the evaluation and purchase of necessary hospital supplies for its member organizations, and its corporate and financial structure, a membership corporation without capital stock and stock *96 holders, paying neither interest nor dividends, compensating only its executive director and employees engaged in its daily operations, with its income in excess of operating expenses returned to its members in the form of “patronage refunds” or retained in a revolving fund to be used exclusively in purchasing items for members, are not the indicia of an organization operating for the primary purpose of carrying on a trade or business for profit. At most, the plaintiff was performing a function which each of its member hospitals would have to assume were it not for the plaintiff’s existence. Our findings 11 and 12 that plaintiff executed Federal income tax returns for the calendar years 1952 and 1953, reporting net incomes of $11,625.49 and $10,362.17, respectively, are to be considered, of course, but they are not decisive on this issue. Forest Press, Inc. v. Commissioner of Internal Revenue, supra. We are here not dealing with a business carried on for profit, with the profit directed to charity, as we considered in the case of Dillingham Transportation Building v. United States, 137 C. Cls. 389, and Knapp Brothers Shoe Manufacturing Corporation v. United States, 135 C. Cls. 797. When all phases of the plaintiff’s activities during the taxable years are taken into account, we feel compelled to hold that it was not an organization operating for the primary purpose of carrying on a trade or business for profit.
The Government contests our finding that plaintiff was comprised entirely of tax-exempt, charitable hospital members. The case was submitted on stipulation. Statements in the record by the Commissioner of Internal Revenue refer to the members of plaintiff as having “* * * established an exempt status for Federal income tax purposes as charitable institutions,” and as being “the several charitable organizations that constitute your [plaintiff’s] membership.” The record contains other joint exhibits wherein the plaintiff states that it is composed of tax-exempt, charitable institutions. There is nothing in the record to contradict this evidence. We believe that the plaintiff has sustained its burden of proof in this respect.
Plaintiff is entitled to recover, together with interest thereon as provided by law, and judgment is entered to that *97 effect. The amount of recovery will be determined pursuant to Bule 38 (c).
It is so ordered.
Need, Justice (Bet.), sitting by designation; MaddeN, Judge/ Whitaker, Judge; and LittletoN, Judge, concur.
FINDINGS OF PACT
The court, having considered the evidence, the report of Commissioner C. Murray Bernhardt, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff was duly organized on January 13, 1934, under the Membership Corporation Law of the State of New York, and since that time it has carried on business as a corporation with its principal office and place of business at 247 Park Avenue, New York, New York. Its books are kept on the accrual basis for calendar years.[4]
2. On February 6,1936, the office of the then Commissioner of Internal Revenue addressed a letter to the plaintiff stating that it was held to be exempt from Federal income tax under provisions in section 101 (6) of the Revenue Act of 1934. This ruling continued in effect under similar provisions in section 101 (6) of the Revenue Acts of 1936, 1938, and the Internal Revenue Code of 1939. Under such ruling and in accord therewith the plaintiff filed no Federal income tax returns and paid no Federal income taxes for any calendar year prior to 1952.
3. On June 27,1952, a letter was addressed to the plaintiff from the office of the Commissioner of Internal Revenue referring to plaintiff’s annual information returns for 1949 and 1950, and to the ruling mentioned in finding 2. Plaintiff was requested to complete and file an exemption application (Form 1023), and also to furnish certain additional information relating to an item of expense on its 1949 return and on its membership and dues, together with a description of its activities. The plaintiff responded on July 22, 1952, in a letter, with enclosures, including a completed Form 1023, a copy of its by-laws, financial data, and state *98 ment of its principal activities, all of which, is in evidence as a joint exhibit.[5]
4. The by-laws submitted by plaintiff provide:
Section 1. Any hospital or similar institution not conducted for profit, and engaged in whole or in part in charitable work, is eligible to membership in this Corporation as an institutional member.
Any incorporated or unincorporated organization wholly owned and controlled by two or more hospitals or similar institutions eligible for Institutional Membership as aforesaid, and empowered to act as purchasing agent therefor, shall be eligible for membership in this Corporation as a Regional Member.
5. Plaintiff’s letter and enclosures of July 22, 1952, referred to in finding 3, provided the following information:
(1) The plaintiff was incorporated as a successor to an organization of a similar name, which had operated from March 1910 to January 1934. Its certificate of incorporation named twelve directors, each residing at a different hospital, nine in the New York area, one in Baltimore, Maryland, one in Boston, Massachusetts, and one in Detroit, Michigan; specified that it was not organized for “pecuniary profit”, and set forth its purposes to be:
(a) To secure to hospitals and other institutions the advantages of cooperation in establishing uniform standards as to the quality and kind of supplies ordinarily used therein and of purchasing the same in accordance with definite specifications under continuing or other general agreements.
(b) To promote the economical and efficient administration of hospitals and other institutions.
(c) To establish and maintain a central purchasing agency.
(2) Under (1) (c) above, the plaintiff’s operations included the solicitation of orders from its members for hospital supplies which it then forwarded to a supplier who shipped the desired merchandise direct to the hospital but sent invoice statements only to the plaintiff who paid *99 promptly to take advantage of discount savings, and them later collected from the member which had ordered and., received the merchandise. The plaintiff actually billed its, member hospitals upon their orders for merchandise am, amount in excess of what it paid the supplier. This plan, was adopted at the annual meeting on March 8, 1945, in» order to avoid release of confidential information as to net • prices with resulting friction between the plaintiff and its-: suppliers, also between such suppliers and their competitors. The excess of collections from members, later re-turned to them by the plaintiff, amounted to $36,296.40 in, 1945 and then increased steadily over intervening years to.» a sum of $134,997.91 in 1951. These are termed patronage-refunds and they represent the difference between the prices, at which member hospitals are billed for merchandise they order .through the plaintiff and the price actually paid by-the plaintiff.
(3)The plaintiff’s membership in 1952 included 207 im~ stitutions grouped into three Councils from which the collected annual dues were as follows:
Under $100,000- $120-
Between $100,000 and $200,000_ 180'
Between $200,000 and $300,000_ 240
Between $300,000 and $500,000_ 300 »
$500,000 and over_ 360»
Council dues are $1,000 a year for the first 10 institutions; $50 a year per institution for the next 20; and’ $25 a year per institution for all over the first 30.
(4) The plaintiff also makes service charges on orders * handled for its members which, in 1949, aggregated $55,-892.83. During that year the plaintiff also withheld for-its own use $18,256.96 in patronage refunds described in, paragraph (2), above.
(5) In addition to the purchasing service rendered to its< member institutions, the plaintiff also maintains a research, department to test and determine the relative merits of" major hospital items from the standpoint of quality and' price. Information secured is furnished to the members,, and it is used in selecting the items purchased for their use. Such tests include laboratory tests and service tests. These-frequently lead to recommendations for improved methods, *100 and economy in the use of materials. Plaintiff issues special printed material on the conservation of hospital equipment and also offers special technical consultant service to its member institutions covering such fields as kitchen and cafeteria equipment, heating, ventilating, and automotive equipment, paints, painting, and other types of supplies. Its publications include special bulletins sent out from time to time, research reports issued intermittently, a semimonthly bulletin (Bureau Buy-Lines), two monthly bulletins (Bureau News) and (Bureau Dietary News). The plaintiff also maintains personal contact with its members through field representatives who call in person at the member hospitals several times a year to discuss questions or problems related to the plaintiff’s services.
(6) The extent of the plaintiff’s activities, in general, appears in a balance sheet as of December 31,1951, and from a statement of income, expenses, and reserves for the calendar year 1951, set forth below:
Hospital Bureau op Standards and Supplies Incorporated
(A Membership Corporation)
Balance Sheet as of December SI, 1951
Assets:
Cash in Banks and Office:
Directors’ Account_$38,169. 57
Treasurer’s Account- 6, 599.88
- $44,769.45
Accounts Receivable :
For merchandise_ 296,329. 57
For dues- 1, 825.00
- 298,154.57
Inventory of Merchandise- 1, 337. 75
Miscellaneous Accounts Receivable- 33,416. 60
Office furniture and fixtures, less depreciation- 414.38
Total Assets- 378, 092.75
Liabilities and Reserves:
Accounts Payable- 68, 868. 78
Taxes Withheld from Employees_ 302. 00
Dues Paid in Advance_ 1, 863.34
Accrued Liabilities- 998.26
Reserve for Dividends to Members- 47,770.36
Total Liabilities- 119, 802.74
*101 Operating Reserve-$258,290.01
Total Liabilities and Reserves_ 378, 092.75
Hospital Bureau op Standards and Supplies Incorporated
Statement of Income, Expenses and Operating Reserve For tbe Year Ended December 31, 1951
Income:
Members’ dues_ $60,999.46
Service charges and mise, income_ 82,227.17
Net discounts earned_ 3,211. 05
Sale of fully depreciated furniture_ 70. 00
Total Income_ 146,507.68
Expenses:
Salaries-$94,242.97
Office expense_ 4,274. 67
.Stationery and printing_ 1, 841. 79
Postage- 3,394.56
Telephone and telegraph_ 2, 585. 88
Rent_ 6, 900. 00
Depreciation of office furniture and fixtures_ 239. 45
■Traveling expenses_ 13, 953. 68
Research _ 1,000. 66
Publicity_ 1,915.70
Public relations_ 307.09
Legal_ 81.30
Federal old age benefits tax_ 1,058.24
Interest expense_ 233.33
Total Expenses_ 132, 029.32
Excess of Income over Expenses for the Twelve Months Ended December 31, 1951, Transferred to Operating Reserve_ 14,478.36
.Operating Reserve at Beginning of Period_ 243,811.65
•Operating Reserve at End of Period_ 258,290.01
6. A letter from tbe office of tbe Commissioner of Internal Revenue to tbe plaintiff on February 5,1958, referred to tbe prior ruling on February 6,1986, and stated that it had been modified to conform to a new ruling requiring the plaintiff *102 to file Federal income tax returns on Form 1120, beginning with the calendar year 1952. Such letter read, in part, as follows:
From the information now before the Bureau it is evident that you were organized and are operated primarily for the purpose of maintaining and operating a purchasing agency for the benefit of your members, and as such, you do not come within the contemplation of Section 101 (6) of the Code. The fact that such activity is carried on by you for the benefit of organizations which have established an exempt status for federal income tax purposes is not controlling in your case.
It is held, therefore, that you are not entitled to exemption from federal income tax under Section 101 (6) of the Code inasmuch as it is the opinion of this office that you are not organized and operated exclusively for any one or more of the purposes specified in that section of the law. * * *
7. On March -12, 1953, plaintiff’s attorneys addressed a letter to the Commissioner of Internal Bevenue requesting a review of the ruling in the letter of February 5, 1953. With this letter they enclosed an affidavit of William A. Gately, who was the salaried executive director of the plaintiff corporation, and a typewritten memorandum entitled “Statement of Counsel”. Both the affidavit and Statement of Counsel are in evidence as joint exhibits.
8. Plaintiff’s affidavit accompanying its letter of March 12, 1953, referred to in finding 7, provided the following information of its activities:
3. Hospital Bureau of Standards and Supplies, Incorporated, has as its only members non-profit making hospital organizations supported in whole or in part by public contributions. Said members carry on a great amount of charitable work. Only non-profit making charitable institutions are eligible for membership. (See Article I, Section 1 of the By-Laws, copy of which is annexed hereto.) * * *
4. The Hospital Bureau of Standards and Supplies, Incorporated’s actual activities consist of the setting-up of purchasing arrangements with various sources of supply whereby the member institutions can purchase these goods more advantageously as a group than would be possible if they were buying individually. Such purchases may be made either through the Hospital *103 Bureau of Standards and Supplies, Incorporated, or direct from the suppliers at prices and under terms and conditions commensurate with the total purchases, of the group. There are two main classes of purchasing arrangements, one known as “Agreements” and the other as “Jobbing Arrangements”. Goods bought under agreement are those which a supplier offers to sell to any member hospital at a definite specified price for a definite period of time, such purchases to be made by the hospital at any time and in any amount desired while the agreement is in effect. Items bought under jobbing arrangements are those wherein the Hospital Bureau of Standards and Supplies, Incorporated, has made an arrangement with some supplier usually a distributor, under which members may buy at a certain price subject to change without notice.
With certain very slight exceptions the Hospital Bureau of Standards and Supplies, Incorporated, makes no purchases for its own account, carries no stock, handles no goods, makes no profit on any of its transactions, and acts only as agent for its member institutions. * * *
When orders are sent to the Hospital Bureau of Standards and Supplies, Incorporated, instead of directly to the suppliers, the Hospital Bureau of Standards and Supplies, Incorporated, pays the suppliers’ bills and in turn collects from the member institutions. Where orders are sent direct by member institutions to the suppliers, the institutions are billed direct by the suppliers, except in one instance. In the case of X-ray item purchases, because of the highly technical nature of the orders, members give their orders directly to the manufacturer’s branch offices or dealers. However, a copy of each .order is sent to the Hospital Bureau of Standards and Supplies, Incorporated, which then pays the .bill, as only m this way can members obtain the available trade discount on this line.
In setting up its purchasing arrangements, either under agreements or jobbing arrangements, the Hospital Bureau of Standards and Supplies, Incorporated, recommends the purchase of those supplies which, from the standpoint of quality, service, and price, represent the most economical purchase available.
From time to time the Hospital Bureau of Standards and Supplies, Incorporated, undertakes a technical analysis of certain lines; e. g., Soaps, Electric Lamps, Absorbent Cotton, etc., and issues a report to the membership supplying them with the necessary data by *104 which they can judge the value of a given offering in the particular line covered. From time to time the Hospital Bureau of Standards and Supplies, Incorporated, issues reports to the members showing the volume of business done under its various lines, and, when requested, furnishes reports on the purchases of individual member institutions.
5. The income of the Hospital Bureau of Standards and Supplies, Incorporated, is derived :
(a) From dues paid in by member institutions. _
_ (b) From cash discounts secured by the Hospital Bureau of Standards and Supplies, Incorporated, in paying the suppliers their bills within the discount limit. These discounts are passed on to member institutions when they in turn pay the Hospital Bureau of Standards and Supplies, Incorporated,_ within the same discount limit based on the date on which the Hospital Bureau of Standards and Supplies, Incorporated, issues its bills. Where the member institution does not pay the Hospital Bureau of Standards and Supplies, Incorporated, within the specified limit, the Hospital Bureau of Standards and Supplies, Incorporated, does not allow the member the cash discount, but credits it to the Revolving Fund, with which purchases are made for the members’ account.
(c) From a Service Charge of approximately 2% on all jobbing items. A 2% Service Charge was put in effect in 1935, having been made necessary by the fact that the growth of the jobbing business had become so great that the expense of handling it, plus the expense of the agreement business, had reached a total which exceeded the income from the dues and the cash discounts not taken by members. For the fiscal years of 1932, 1933, and 1934, the Hospital Bureau of Standards and Supplies, Incorporated, operated at a deficit, using up part of the Revolving Fund to meet operating ex-genses. In order to overcome this deficit, the 2% ervice Charge on jobbing orders was adopted.
Until 1945, members were allowed to order any brand item desired in any quantity, no matter how small. In 1945 it was found that orders were handled in that year for 15,000 different brand items, on 80% of which the annual dollar volume was considerably less than $100 each. The excessive cost of such operation resulted in a net deficit, and consequent reduction of the Revolving Fund, for the period 1940-1946 inclusive. The brand items were therefore simplified, and cut to *105 about 350 in number, and the system of computation of Service Charges was revised. The prior practice of disclosing to member institutions the exact net prices seemed from suppliers for every item had led to dissemination of tins information by some members to dealers, distributors, and competing suppliers, which caused several suppliers to state that if that practice were continued, they would no longer do business with the Hospital Bureau of Standards and Supplies, Incorporated.
Therefore, a policy was adopted whereby suppliers set the prices at which member institutions are billed, which prices are quoted to members by the Hospital Bureau of Standards and Supplies, Incorporated. The difference between these prices and the net prices allowed by suppliers to the Hospital Bureau of Standards and Supplies, Incorporated, less a small mark-up in some cases, is placed to the credit of each member institution, which institution receives a credit memo or check at the end of each quarter. These returns are given the title of “Patronage Kefunds”. In order to meet expenses, a certain percentage of these are withheld by the Hospital Bureau of Standards and Supplies, Incorporated; this percentage has averaged about 15%.
* $ ‡ $
The Hospital Bureau of Standards and Supplies, Incorporated, receives no special discounts for its own use exclusively, from any supplier.
All income in excess of operating expenditures is placed in the Revolving Fund of the Hospital Bureau of Standards and Supplies, Incorporated, which Fund is used exclusively for the purchasing of goods for the members. The Fund is at present turned over more frequently than once per month, due to the amount of business being done.
6. The Hospital Bureau of Standards and Supplies, Incorporated, being a membership corporation, has no capital stock, has no stockholders, and pays no interest or dividends of any kind.
7. All income in excess of operating expenditures is credited to the Revolving Fund for purchases, and cannot inure to the benefit of any individual. Under the terms of the By-Laws, Article X, Section 1, upon termination of the existence of the Hospital Bureau of Standards and Supplies, Incorporated, any assets remaining after all liabilities have been paid or provided for would *106 be divided among all members of the corporation at the time of such dissolution in proportion to the total • dues and assessments paid by them to the corporation from the date of incorporation, January 13, 1934.
8.No member of the Corporation, no member of the Board of Directors, and no Officer receives any salary, allowance, or other form of emolument, except that Mr. William A. Gately, Executive Director, who receives a salary' as such, is also an Assistant Treasurer. _ Mr. Gately receives no salary or other income as Assistant Treasurer. Salaries are paid only to the employees of the Hospital Bureau of Standards and Supplies, Incorporated, who are actually and wholly engaged in the daily operation of the Hospital Bureau of Standards and Supplies, Incorporated.
9. a. Plaintiff’s Statement of Counsel accompanying its letter of March 12, 1953, referred to in finding 7, was, in substance, a request that the ruling issued on February 5, 1953, be reviewed for stated reasons, including (1) that the activities of the plaintiff were inseparable from its member hospitals and its operations were an integral part of their operations; (2) that plaintiff’s business activities were not of the type ordinarily carried on for commercial purposes; (3) that no part of its net earnings inured to the benefit of private shareholders or individuals but the plaintiff merely had an excess of income over expenses which it turned back to members periodically; (4) that plaintiff is not a “feeder” corporation and is not organized or operated for the primary purpose of profit; and (5) that no substantial part of plaintiff’s activities consists of carrying on propaganda or otherwise attempting to influence legislation.
b. In 1951 plaintiff was granted institutional membership in the American Hospital Association.
c. Plaintiff’s activities have effected savings to the hospitals constituting its membership.
10. The office of the Commissioner of Internal Eevenue did not directly reply to the letter of March 12, 1953, from plaintiff’s attorneys, but on September 9, 1953, a letter was addressed to the plaintiff and a copy sent to their counsel reading, in part, as follows:
In determining whether an organization is subject to tax under the Federal statutes the facts involved in each *107 case must be carefully considered. It is shown that your activities consist primarily of the purchase of supplies and the performance of other related services for the several charitable organizations that constitute your membership. It is apparent that such activities in themselves cannot be termed charitable, but are ordinary business activities.
Under the provisions of Section 101 of the Code an organization which is operated for the primary purpose of carrying on a trade or business for profit is not exempt from federal income tax, notwithstanding that any profits derived are payable to one or more exempt organizations. Further, under the regulations which interpret such section, it is clear that a corporation formed to service several tax-exempt organizations is not itself exempt if the services performed would be unrelated activities if carried on by any one of the tax-exempt organizations served.
In view of the foregoing, it is evident that you are a corporation which is organized for business purposes and accordingly are not entitled to exemption since your activities are not an integral part of any one or more of the hospitals or institutions served by you for the reason that you serve several hospitals and institutions, which activities if carried on by any one of such organizations on behalf of the others would be clearly unrelated to it within the meaning of the above-referred-to provisions of law and the regulations thereunder.
Accordingly, Bureau ruling dated February 5, 1953, holding that you are not entitled to exemption under Section 101 (6) of the Code is hereby affirmed, and you are required to file income tax returns on Form 1120 in accordance therewith beginning with the year 1952.
The Chief Counsel for the Bureau of Internal Revenue concurs in the conclusion reached herein.
11. On March 12, 1953, plaintiff’s officers executed a Federal income tax return for the calendar year 1952 on Treasury Form 1120 reporting a total gross income of $146,793.09 with deductions therefrom aggregating $135,167.60 and a net income of $11,625.49 with a total income tax of $3,487.65. Such return and a check in payment of the tax shown thereon were delivered with a letter dated March 16, 1953, by plaintiff’s attorneys to the Director of Internal Revenue for Lower Manhattan at the Custom House, New York, New York. *108 The return was filed and the tax paid under a protest in writing. The reported income of $146,793.09 was itemized in an exhibit attached to the return as follows: Members dues — $60,434.44, Service Charges and Miscellaneous Income — $83,201.14, Net Discounts Earned — $3,063.51, and sale of fully depreciated furniture — $94. The deductions claimed on the return included $96,355.30 for salaries and wages, $6,900 for rent, $1,091.11 for Federal Old. Age Benefits Tax, $239.84 for depreciation on office furniture and fixtures and $30,581.35 for expenses separately itemized as follows: Office expense — $3,736.11, Stationery and printing — $2,236.47, Postage — $3,842.12, Telephone and telegraph — $2,655.42, Publicity — $2,337.94, Traveling expense— $13,088.76, Besearch — $2,597.94, and Inventory of supplies written of $176.58.
12. On March 12,1954, the plaintiff filed its Federal income tax return for the calendar year 1953 on form 1120 reporting a total gross income of $152,529.25 with deductions therefrom aggregating $142,167.08 and a net income of $10,362.17 with a total income tax of $3,108.65. Such return and payment of the tax shown thereon were delivered to the Director of Internal Bevenue under a written protest. The reported income of $152,529.25 was itemized in an exhibit filed with the return as follows: Members dues — $60,036.39, Service charges and Miscellaneous Income — $89,401.66, Net discounts earned — $3,006.20, and Sale of fully depreciated furniture and fixtures — $85. The deductions claimed on the return included $99,517.57 for salaries and wages, $7,590 for rent, $1,127.43 for Federal Old Age Benefits Tax, $373.41 for depreciation on office furniture and fixtures, $2,040.61 for term life insurance and hospital and surgical contracts for the benefit of 25 employees who made no individual contributions, and $31,518.06 for expenses separately itemized as follows: Office expense — $4,084.86, Stationery and printing— $3,114.94, Postage — $3,085.35, Telephone and telegraph— $2,848.17, Traveling expense — $14,056.52, Besearch — ■ $1,886.16, Publicity — $1,914.96, and Legal fees — $527.10.
13. Plaintiff’s balance sheets at the beginning and at the end of the calendar years 1952 and 1953 appear below:
*109 1-1-52 12-1-62 01-1-53 12-31-63
ASSETS
Cash----$$44,769.45 $78,320.47 $68,358.53
Accounts receivable. 298,154. 57 269,429.71 360,172.43
Office furniture & fixtures: Less reserve for depreciation (net)--414.38 697.27 1,714.64
Rebates due from suppliers. 32,816.35 38,087.94
Due from non-members--48.49
Advances to Field Representatives.. 200.00 419.32 145.63
Advance payments to Suppliers.. 352.76 18,032.97 364.21
378,092.75 407,871.00 431,488.13
LIABILITIES
Accounts payable. 68,868.78 81,270.09 93,647.25
Tax withheld from employees. 302,00 1,682.63 1,614.23
Dues received in advance_ 1,863.34 1,950.67 2,816.67
Accrued liabilities. 998.26 865.23 3,965.97
Rebates payable to members— 47,770.36 52,286.98 66,762.64
Operating reserve__— 258,290.01 269,915.60 273,681.37
378,092.75 407,871.00 431,488.13
14. On October 16,1958, tlie plaintiff timely filed a formal claim for refund of $3,487.65, with interest at 6 percent per annum, for the calendar year 1952. On May 28, 1954, the plaintiff timely filed a similar refund claim for the calendar year 1953 for an amount of $3,108.65, with interest at 6 percent per annum. No action had been taken by the Commissioner of Internal Eevenue upon either of the two claims for refund on December 20, 1954, when the petition was filed in this cause. Since that date each refund claim has been disallowed in full, with registered notice to the plaintiff as provided in section 6532 (a) (1) of the Internal Eevenue Code of 1954. Each claim for refund set forth as grounds and reasons for allowance an attached addendum reading:
Claimant is entitled to exemption from income taxes pursuant to Section 101 (6) of the Internal Eevenue Code.
The Hospital Bureau of Standards and Supplies, Incorporated, is a membership corporation organized under the laws of the State of New York. All of its members are nonprofit charitable institutions, and its By-Laws provide that only such institutions are eligible for membership.
The Hospital Bureau of Standards and Supplies, Incorporated, has no capital stock, and no stockholders. *110 It operates as a centralized agency for purchases of necessary hospital supplies by its members. All of its income in excess of actual operating expenditures is placed in a “Revolving Fund” from which such purchases are made. No compensation is paid to any individuals other than those actively engaged in the daily functions of the corporation.
The claimant handles no goods, carries no stock, and, with two very small exceptions, makes no purchases for its own account. Its activities are an integral and inseparable part of the operations of its charitable members, whose present standards of efficiency and low cost of operation are made possible only by the securing to them of the advantages of group purchasing and centralized analysis of necessary items.
The claimant is not a “feeder” corporation, and is not organized and operated for the primary purpose of carrying on a trade or business for profit. All of its functions are within the scope of the activity of its charitable members.
No part of claimant’s activities is carrying on propaganda or otherwise attempting to influence legislation.
15. In 1951 plaintiff was granted institutional membership in the American Hospital Association.
16. Plaintiff’s activities have effected savings to the hospitals constituting its membership.
17. During the calendar years 1952 and 1953 plaintiff was composed of charitable, tax-exempt member organizations.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, together with interest thereon as provided by law, and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Rule 38 (c).
In accordance with the opinion of the court and on a memorandum report of the commisisoner as to the amount due thereunder, it was ordered May 7, 1958, that judgment for the plaintiff be entered for $3,487.65 for 1952, and $3,108.65 for 1953, with interest on each sum as provided by law.

 § 101. Exemption from tax on corporations.
*******
(6) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, ¡no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation. * * *

 Treasury Regulations 111, §29.101-3 (b), promulgated August 4, 1952, provides in part as follows :
* * * If a subsidiary organization of a tax-exempt organization would itself be exempt on the ground tbat its activities are an integral part of the exempt activities of the parent organization, its exemption will not be lost because, as a matter of accounting between the two organizations, the subsidiary derives a profit from its dealings with its parent organization, for example, a subsidiary organization which is operated for the sole purpose of furnishing electric power used by its parent organization, a tax-exempt educational organization, in carrying on its educational activities. However, the subsidiary organization is not exempt from tax if it is operated for the primary purpose of carrying on a trade or business which would be an unrelated trade or business (that is, unrelated to exempt activities) if regularly carried on by the parent organization. For example, if a subsidiary organization is operated primarily for the purpose of furnishing electric power to consumers other than its parent organization (and the parent’s tax-exempt subsidiary organization), it is not exempt since such business would be an unrelated trade or business if regularly carried on by the parent organization. Similarly, if the subsidiary is owned by several unrelated exempt organizations, and is operated for the purpose of furnishing electric power to each of them, It is not exempt since such business would be an unrelated trade or business if regularly carried on by any one of the tax-exempt organizations.

 The Revenue Act of 1950, c. 994, 64 Stat. 906, § 301 (b) provides:
FEEDER ORGANIZATIONS. — Section 101 is hereby amended by adding at the end thereof the following paragraph :
“An organization operated for the primary purpose of carrying on a trade or business for profit shall not be exempt under any paragraph of this section on the ground that all of its profits are payable to one or more organizations exempt under this section from taxation. For the purpose of this paragraph the term ‘trade or business’ shall not include the rental by an organization of its real property (including personal property leased with the real property).”

 The separated issue of liability only is presented in tbis report pursuant to Rule 38 (c) and a stipulation of tlie parties filed February 18, 1957.

 This and ail other documents In the record were stipulated by the parties as joint exhibits pursuant to a stipulation filed by the parties on February 18, 1957. Paragraph 11 of the stipulation provided, in part, that “The parties admit only the correctness of facts, not conclusions, appearing in such exhibits.”