113 T.C. No. 3

UNITED STATES TAX COURT

REDLANDS SURGICAL SERVICES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 11025-97X.                    Filed July 19, 1999.


     P is a nonprofit corporation.  Its sole activity
is participating as co-general partner with a for-
profit corporation in a partnership that is general
partner of an operating partnership that owns and
operates an ambulatory surgery center.  <u>Held</u>:  On the
facts involved herein, P has ceded effective control
over the operations of the partnerships and the surgery
center to private parties, conferring impermissible
private benefit.  P is therefore not operated
exclusively for exempt purposes within the meaning of
sec. 501(c)(3), I.R.C. 1986.

<u>James L. Malone III</u> and <u>Robert C. Louthian III</u>, for

petitioner.

<u>Joan Ronder Domike</u> and <u>Elizabeth Purcell</u>, for respondent.

THORNTON, Judge: Petitioner brought this action for a declaratory judgment, pursuant to section 7428 and Title XXI of this Court's Rules. Petitioner requests the Court determine the correctness of respondent's adverse determination with respect to its initial qualification as a tax-exempt organization under section 501(c)(3).[1] The parties have submitted this case fully stipulated under Rule 122 on the basis of the pleadings and the stipulated administrative record, which is incorporated herein by this reference.

FINDINGS OF FACT

Petitioner is a California nonprofit public benefit corporation with its principal place of business in Redlands, California. It is a wholly owned subsidiary of Redlands Health Systems, Inc. (RHS), a California nonprofit public benefit corporation that has been recognized as exempt under section 501(c)(3) of the Code and as a public charity within the meaning of section 509(a). RHS is the parent corporation of three subsidiaries in addition to petitioner, namely Redlands Community Hospital (Redlands Hospital) and Redlands Community Hospital Foundation (Redlands Foundation), both of which are California nonprofit public benefit corporations that have been recognized

_____

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code as in effect for the time period referred to. All Rule references are to the Tax Court Rules of Practice and Procedure.

as exempt under section 501(c)(3); and Redlands Health Services, a for-profit corporation.

As described in more detail below, and as reflected schematically in the appendix hereto, in 1990 RHS became co-general partner with a for-profit corporation, Redlands-SCA Surgery Centers, Inc. (SCA Centers), in a general partnership formed to acquire a 61-percent interest in an existing outpatient surgical center in Redlands, California, two blocks from the Redlands Hospital facility. This general partnership in turn became sole general partner in the California limited partnership that owns and operates the surgical center. Under a long-term management contract, SCA Management Co. (SCA Management)--a for-profit affiliate of SCA Centers--manages the day-to-day operations of the surgical center, in return for a percentage of gross revenues. Several months after forming the general partnership, RHS formed petitioner to succeed to its interest in it.

Petitioner has no activity other than its involvement with the partnerships. The question is whether petitioner is operated exclusively for exempt purposes within the meaning of section 501(c)(3). We hold that it is not.

Redlands Hospital

Since its founding in 1929, Redlands Hospital has been recognized by respondent as a charitable organization described

in section 501(c)(3) and as a "hospital" described in section 170(b)(1)(A)(iii).  Its mission includes providing necessary medical care free of charge, or at a discount, to individuals without insurance or other means of paying.

Redlands Hospital has its own outpatient surgery program within the hospital facility.  It also maintains a 24-hour emergency room that provides emergency medical services for all patients regardless of their ability to pay.  It maintains an open medical staff and is governed by a community-based board of directors.  It does not discriminate on the basis of race, gender, age, color, national origin, or disability.

## Inland Surgery Center, L.P.

Since its inception in 1983, the Inland Surgery Center Limited Partnership (the Operating Partnership) has operated a freestanding ambulatory surgery center (the Surgery Center) in a 12,000-square foot building within two blocks of Redlands Hospital.  During the 1980's, the Operating Partnership was a successful for-profit venture, serving only surgical patients who were able to pay, by insurance or otherwise.  Prior to its affiliation with the General Partnership, the Operating Partnership comprised Beaver Medical Clinic, Inc., and some 30 physician partners, who were also physicians on the medical staff of Redlands Hospital.

The Affiliation of Redlands Hospital With the Surgery Center

Before 1990, Redlands Hospital desired to increase its outpatient surgery capacity but lacked the capital resources and experience to develop and operate its own freestanding outpatient facility. In addition, such a facility would have been in competition with the existing Surgery Center, and there was concern that the Redlands community could not sustain both.

On March 1, 1990, RHS and SCA Centers entered into a general partnership agreement to acquire jointly a 61-percent general partnership interest in the Surgery Center.[2] The partnership is known as Redlands Ambulatory Surgery Center (the General Partnership).

SCA Centers is a for-profit, wholly owned subsidiary of Surgical Care Affiliates, Inc. (SCA), a publicly held corporation based in Nashville, Tennessee, and specializing in owning and managing ambulatory surgery centers.[3] Prior to formation of the General Partnership, neither SCA nor any of its affiliated entities had any relationship, contractual or otherwise, with RHS or any of its affiliated entities, or with the Surgery Center.

---

[2] Redlands Hospital is also a signatory to the general partnership agreement but only with respect to secs. 16 and 17 of that agreement (regarding noncompetition and affiliated status).

[3] As of 1995, SCA owned, in whole or part, and operated approximately 40 ambulatory surgery centers throughout the United States, some of which were owned in part by tax-exempt health care systems.

RHS contributed $1,131,289 to the General Partnership, borrowing $796,829 from SCA and the balance of $334,460 from Redlands Hospital.  SCA Centers contributed $1,946,993 in cash and stock to the General Partnership.  In return for its approximately 37-percent capital investment, RHS received a 46-percent interest in profits, losses, and cash-flows of the General Partnership.  In return for its approximately 63-percent capital investment, SCA Centers received a 54-percent interest in profits, losses, and cash-flows of the General Partnership.

The General Partnership agreement provides in relevant part:

### AGREEMENT OF GENERAL PARTNERSHIP
### OF REDLANDS AMBULATORY SURGERY CENTER

This AGREEMENT OF GENERAL PARTNERSHIP, [is] entered into as of the 1st day of March, 1990, by and between REDLANDS-SCA SURGERY CENTERS, INC., a California corporation ("SCA Centers") and a wholly owned subsidiary of Surgical Care Affiliates, Inc. ("SCA") * * *, RHS Corp., ("RHS") a California not-for-profit corporation, * * * and Redlands Community Hospital, a California not-for-profit corporation (the "Hospital").  SCA Centers and RHS are collectively referred to as "Partners."

WITNESSETH:

WHEREAS, RHS desires to insure the availability of high quality health services in the most cost effective setting in which such services can be rendered; and

WHEREAS, the use of an ambulatory surgical center by the area-wide residents will contribute to RHS's corporate goal of providing comprehensive health care services at an affordable price; and

WHEREAS, SCA is a corporation that is engaged in the development and management of

ambulatory surgical centers and has the expertise necessary to operate ambulatory surgical centers; and

WHEREAS, RHS and SCA Centers desire to enter into a Partnership to be equally controlled by representatives of the Partners.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, SCA Centers and RHS agree to be partners in a general partnership (the "Partnership") pursuant to the California Uniform Partnership Act (the "Act") on the terms and conditions hereinafter set forth.

1.    Name and Purpose.

      (a)  The Partnership shall be carried on under the name of Redlands Ambulatory Surgery Center or such other name as may be selected by the Managing Directors. The Partnership has been formed to acquire a 61 percent general partner interest (the "General Partner Interest") in a California limited partnership (the "Operating Partnership") which owns and operates a freestanding ambulatory surgery center in Redlands, California known as the Inland Surgery Center (the "Center"). The Partnership may engage in any and all other activities as may be necessary, incidental or convenient to carry out the business of the Partnership as contemplated by this Agreement.

              *    *    *    *    *    *    *

3.    Term.  The Partnership shall commence on April 30, 1990, or such later date as the Partners shall mutually agree, and shall continue until March 31, 2020, or such other date as the partners shall mutual [sic] agree.

4.    Management.

(a)  General Management by the Managing Directors.
The general management and determination of all
questions relating to the affairs and policies of
the Partnership, except for questions relating to
the medical standards and medical policies of the
centers, shall be decided by a majority vote of
the Managing Directors.  The Managing Directors
shall consist of four (4) persons, two (2) of whom
shall be chosen by SCA Centers and two (2) of whom
shall be chosen by RHS.  Notwithstanding the
above, it is recognized that the Managing
Directors have no authority to amend the
Partnership Agreement.  In the event the Managing
Directors are unable to agree on a matter, either
Partner may institute the following arbitration
procedure to resolve the matter.  Within three (3)
days of a Partner's notifying the other of
institution of this arbitration procedure, each
Partner shall select an arbitrator to resolve the
matter.  Within seven (7) days after the selection
of the arbitrators, those arbitrators shall select
a third.  Within five (5) days after selection of
the third arbitrator, each Partner shall submit in
writing to each of the arbitrators the Partner's
position on the matter to be resolved.  The
arbitrators shall decide the matter and advise the
Partners in writing of their decision within
fourteen (14) days after the Partners' submission
of their written positions.  In hearing such
arbitration the arbitrators shall determine the
procedural rules to be applied and shall apply the
substantive law of the State of California without
regard to conflict of law considerations.  The
decision of a majority of the arbitrators shall be
final and binding.  The costs and expenses of the
arbitrators shall be divided equally between the
Partners.

(b)  Medical Advisory Group.  The
determination of all questions relating
to the medical standards and medical
policies of the center shall rest with
the Medical Advisory Group.  The
determination as to what constitutes a
medical decision, standard or policy
shall rest with the Managing Directors.
The Managing Directors shall select 50
percent of the Medical Advisory Group.

(c) <u>Operating Partnership Agreement and Purchase Agreement</u>.  RHS hereby authorizes SCA Centers to execute on behalf of the Partnership:  (i) the Operating Partnership's Partnership Agreement; (ii) an agreement to acquire the General Partner Interest (the "Purchase Agreement"); and (iii) all exhibits to the Purchase Agreement.

*   *   *   *   *   *   *

12.  <u>Management Agreement</u>.  The Operating Partnership shall enter into a Management Agreement with SCA Management Company, a wholly-owned subsidiary of SCA ("Management") whereby Management assumes full responsibility for administering the day-to-day operation of the ambulatory center in accordance with the goals, policies and objectives of the Operating Partnership.  The Agreement will be for a term of fifteen (15) years with two (2) five (5) year extensions at Management's sole discretion and will provide Management with a fee equal to Six Percent (6%) of the Operating Partnership's gross revenues.  Legal, accounting, travel, lodging, meals and other such professional services associated with the management and administration of the ambulatory surgery center shall be reimbursed to Management.

13.  <u>Quality Assurance Agreement</u>.  Management shall enter into an [sic] Quality Assurance Agreement with RHS whereby RHS will agree to perform certain managerial and supervisory quality assurance duties in connection with the operation of the Center.  The Quality Assurance Agreement will continue from year to year unless terminated by either of the parties thereto.  RHS will receive no fee under the Quality Assurance Agreement during the first year thereof and thereafter will be paid a fee equal to one percent of gross revenues as defined in such Agreement, payable monthly.

*   *   *   *   *   *   *

16. <u>Non-Compete</u>.  The Partners and RHS hereby agree that during the term of this Partnership, and for two years thereafter, neither party, nor an affiliate of either party, shall participate in the ownership, management or development of a free-standing surgical center which is within those portions of San Bernardino and Riverside Counties falling within a twenty (20) miles radius of the Center unless authorization is obtained from the other party.  Further, the Hospital shall not expand or promote its present outpatient surgery program within the Hospital.  Notwithstanding the foregoing in the event that either Partner acquires the entire interest of the other Partner herein, this Section 16 shall not apply thereafter to the purchasing Partner or its affiliates.

17. <u>Affiliated Status</u>.  To the extent legally permissible, the Hospital agrees to recognize the surgery center as an affiliate for managed care contracting purposes (i.e., HMOs and PPOs).

18. <u>New Services and Procedures</u>.

   (a)  Exhibit B lists medical services and procedures currently available at the Center and those which the Partners expect to be performed there in the near future.  SCA Centers acknowledges that (1) RHS is an affiliate of the Hospital, and (2) that the Hospital enjoys a valuable reputation in the area for providing quality medical care to patients, (3) that the Hospital's association with the Center through RHS's participation in this Partnership will benefit the Center and (4) that RHS has an important interest in ensuring that services and procedures performed at the Center, or by an entity with which RHS is associated by virtue of this Partnership, within the Hospital's service area are only such services and procedures which are recognized by a majority of the medical community as

being safely and efficaciously performed in a non-hospital, outpatient setting.

(b)  Unless otherwise approved by the Managing Directors (whose actions in matters under this Paragraph shall be final and not subject to arbitration or review, even if deadlocked), no procedures or services currently available to patients in the State of California which are not listed on Exhibit B shall be performed at the Center (or by RHS, SCA or the Center limited partnership, or an affiliate of any of them, excluding the Hospital), within the area set forth in Paragraph 16, unless and until such procedures or services are performed or available on a non-hospital, outpatient basis at a majority of the free-standing outpatient surgery facilities in Imperial, Kern, Los Angeles, Orange, Riverside, San Bernardino, San Diego and Ventura Counties.

(c)  With respect to new services or procedures which first become available in California during the term hereof, such services or procedures shall not be performed by RHS, SCA, the Center limited partnership or an affiliate of any of them in the area identified above until the Managing Directors determine, based on reliable medical evidence and/or testimony, that such services and procedures can be safely and efficaciously performed on a non-hospital, outpatient basis.

*     *     *     *     *     *     *

23.  Assignment.  Each Partner shall have the right, without the prior approval of the other and without triggering the provisions of paragraph 14 hereof, to transfer or assign all or any part of its interest in this Partnership to an affiliated entity; * * * in the event either Partner assigns its

interest hereunder the provisions of Section 16, shall continue to apply to the assignor, as well as to the assignee, and the interest held by the assignee shall be subject to repurchase as provided in Section 19 hereof, upon the breach of Section 16 by the assignor, the assignee [or] their Affiliates.

## The General Partnership's Acquisition of the Operating Partnership Interest

Effective April 30, 1990, the General Partnership entered into an amended and restated agreement of the Operating Partnership in accordance with the Revised Limited Partnership Act of the State of California. Pursuant to this agreement, the General Partnership acquired, for approximately $3 million, a 61-percent general partnership interest in the Operating Partnership.[4] As part of the purchase price, the General Partnership agreed to contribute $1,598,495 by delivering to the limited partners (with the exception of Beaver Medical Clinic) shares of SCA common stock with an equivalent market value.[5]

---

[4] Prior to Apr. 30, 1990, the three general partners of the Operating Partnership were two individuals who had aggregate ownership interests of 24 percent, and Beaver Medical Clinic, Inc., which had a 6-percent ownership interest. Effective Apr. 30, 1990, the two individual general partners sold their aggregate 24-percent interests, and Beaver Medical Clinic, Inc. converted its 6-percent general partner interest into a 10.3-percent limited partner interest. The other limited partners are physicians who are also on the medical staff of Redlands Hospital.

[5] The General Partnership subsequently reduced its ownership interest in the Operating Partnership to 59 percent as a result of the sale of 2 percent of the general partner interest to a

(continued...)

To determine the General Partnership's investment, the Operating Partnership was valued at four to five times earnings. No formal appraisal was acquired; rather, the valuation was determined based on SCA's experience and knowledge of the market and by a review of historical records. An unrelated bidder (a for-profit company, not otherwise identified in the record) was offering the Operating Partnership a higher purchase price based on approximately six times earnings. The existing partners of the Operating Partnership agreed to the offer made by the General Partnership due to the desire to have an affiliation with Redlands Hospital for quality control review and other reasons, such as to supervise the teaching and maintenance of up-to-date surgery methodologies.

The General Partnership is the sole general partner of the Operating Partnership. There are 32 limited partners. Except for Beaver Medical Clinic, Inc., the limited partners are all physicians who are also on the medical staff of Redlands Hospital. Two of the limited partners are board members of Redlands Hospital and RHS. The amended Operating Partnership agreement contains no statement of charitable purpose and imposes no requirement that the Operating Partnership operate for a

---

[5](...continued)
physician, with that interest then being converted to a limited partner interest. The limited partners currently have a 41-percent interest in the Operating Partnership.

charitable purpose.  Relevant portions of the amended Operating Partnership agreement are set out below:

AMENDED AND RESTATED CERTIFICATE AND AGREEMENT
OF LIMITED PARTNERSHIP
OF INLAND SURGERY CENTER, L.P.

\*     \*     \*     \*     \*     \*     \*

IV.  BUSINESS

The business of the Partnership is to own and operate the Center and to carry on any and all activities necessary, proper, convenient, or advisable in connection therewith.

\*     \*     \*     \*     \*     \*     \*

VI.  CAPITAL CONTRIBUTION, STATUS AND
ADDITIONAL WORKING CAPITAL

6.1  <u>Capital Contribution of the General Partner</u>.  Upon execution of this Agreement, the General Partner will contribute $1,979,077 to the Partnership to be paid $1,655,842 by check or by wire transfer and $1,598,495 by delivering Shares,[6] which shall be simultaneously distributed to the Limited Partners, other than [Beaver Medical Clinic], in the amounts set forth on Schedule C. For purposes of payment of the contribution, the Shares shall be valued at the average of the closing prices of the Shares, as reported by the NASDAQ National Market System, on each of the five trading days which are prior to the ten business days prior to April 30, 1990.

\*     \*     \*     \*     \*     \*     \*

SCA will also make available to each Limited Partner, other than [Beaver Medical Clinic], appropriate officers of SCA who will respond to questions relating to the material furnished and the business and affairs of SCA.

The Limited Partners who receive such shares shall not sell, exchange, pledge hypothecate or otherwise dispose

---

[6] Paragraph 1.25 of the Operating Partnership agreement defines "Shares" as "$.01 par value common stock of SCA".

of the shares prior to the date six months have elapsed from the date this Agreement is executed. In any transfer of the Shares, the Limited Partners shall comply with the prospectus delivery requirements of the Securities Act of 1933.

\*　　\*　　\*　　\*　　\*　　\*　　\*

7.3 <u>Management Fees</u>. SCA Management Company, a subsidiary of SCA, will enter into a Management Agreement with the Partnership pursuant to which SCA Management Company will provide management, purchasing and other services and support to the Partnership. SCA Management Company will be reimbursed for any direct costs incurred in managing the Partnership and will be paid an annual management fee equal to 6% of the Partnership's Gross Revenues payable monthly.

VIII. ALLOCATION OF INCOME AND LOSS: CASH DISTRIBUTIONS

8.1 <u>Available Cash Flow</u>. The Partnership shall distribute Available Cash Flow and any other property received by the Partnership as a result of the operations of the Center or sale of its assets (a) 1.1366% to the holder of each outstanding Unit,(b) 10.3% to [Beaver Medical Clinic] and (c) the balance to the General Partner.

\*　　\*　　\*　　\*　　\*　　\*　　\*

8.4 <u>Profits and Losses</u>. Profits and losses shall be allocated 10.3% to [Beaver Medical Clinic], 1.1366% to the holder of each Unit and the balance to the General Partner. \* \* \*

\*　　\*　　\*　　\*　　\*　　\*　　\*

IX. RIGHTS, POWERS AND OBLIGATIONS OF THE GENERAL PARTNER

9.1 <u>Powers</u>. The management and control of the Partnership and its business and affairs shall rest exclusively with the General Partner, which shall have all the rights and powers which may be possessed by a general partner pursuant to the Act, and such additional rights and powers as are otherwise conferred by law or are necessary, advisable or convenient to the discharge of its duties under this Agreement. The General Partner shall be the "tax matters partner" within the meaning of the Code. Without

limiting the generality of the foregoing, the General Partner may, at the cost, expense and risk of the Partnership:

9.1.1.   Spend the capital and net income of the Partnership in the exercise of any rights or powers possessed by the General Partner hereunder;

9.1.2.   Lease the Land, manage and operate the Center and enter into agreements containing such terms, provisions and conditions as the General Partner in its discretion shall approve;

9.1.3.   Purchase from or through others contracts of liability, casualty and other insurance which the General Partner deems advisable for the protection of the Partnership or for any purpose convenient or beneficial to the Partnership;

9.1.4.   Incur indebtedness in the ordinary course of business;

9.1.5.   Subject to the provisions of Section 9.4.1.2 of this Agreement, sell or otherwise dispose of, upon such terms and conditions as the General Partner may deem advisable, appropriate or convenient, any of the assets of the Partnership;

9.1.6.   Invest in short-term debt obligations (including obligations of federal and state governments and their agencies, commercial paper and certificates of deposit of commercial banks, savings banks or savings and loan associations) and "money market" mutual funds, such funds as are temporarily not required for the purposes of the Partnership's operations; and

9.1.7.   Delegate all or any of its duties hereunder and, in furtherance of any such delegation, appoint, employ, or contract with any person (including affiliates of the General Partner) for the transaction of the business of the Partnership, which persons may, under the supervision of the General Partner, act as consultants, accountants, attorneys, brokers, escrow agents, or in any other capacity deemed by the General Partner necessary or desirable, and

pay appropriate fees to any of such persons; provided, however, the General Partner shall not delegate duties hereunder which are required to be performed by SCA Management Company under the Management Agreement.

9.2.  Independent Activities.  Subject to the provisions of Section 16.2 of this Agreement, the General Partner and each Limited Partner may, notwithstanding the existence of this Agreement, engage in whatever activities they choose, whether or not the same be competitive with the Partnership, without having or incurring any obligation to offer any interest in such activities to the Partnership or any party hereto, and, as a material part of the consideration for the General Partner's execution hereof and for the admission of such Limited Partner, each Limited Partner hereby waives, relinquishes and renounces any such right or claim of participation.

9.3.  Duties.  The General Partner shall manage and control the Partnership, its business and affairs to the best of its ability and shall use its best efforts to carry out the business of the Partnership.  The General Partner shall devote itself to the business of the Partnership to the extent that it, in its discretion, deems necessary for the efficient carrying on thereof.  The General Partner shall act as a fiduciary with respect to the safekeeping and use of the funds and assets of the Partnership.

9.4.  Certain Limitations.

9.4.1  Without obtaining the consent of all of the Partners, the General Partner shall not:

9.4.1.1.  Act in contravention of this Agreement;

9.4.1.2.  Except as provided in Article XII of this Agreement, do any act which would make it impossible to carry on the ordinary business of the Partnership;

9.4.1.3.  Confess a judgment against the Partnership;

9.4.1.4.  Assign the Partnership property in trust for creditors or on the assignee's promise to pay the debts of the Partnership;

9.4.1.5. Submit a Partnership claim or liability to arbitration or reference; or

9.4.1.6. Dispose of the goodwill of the Partnership.

* * * * * * *

9.6. <u>Medical Advisory Group</u>. The Partnership shall have a Medical Advisory Group consisting of six Limited Partners appointed annually. Three members of the Medical Advisory Group shall be appointed by [Beaver Medical Clinic]. The three remaining members shall be appointed by the General Partner. Vacancies in the Medical Advisory Group shall be filled in accordance with the above procedure. Subject to law regulations, and the standards of applicable regulatory bodies, the medical standards of the Partnership will be under the control of the Medical Advisory Group. The General Partner will determine what are medical standards and policies.

* * * * * * *

10.4 <u>Government Regulation</u>. In the event that, in the opinion of counsel to the Partnership, the referral of Medicare or any other patients to the Center by Partners becomes illegal, the Partnership shall require each Limited Partner to offer his interest to the General Partner for five times the reportable taxable income allocated to that interest on the Partnership Return for the tax year immediately preceding the year in which counsel determines such reference is illegal. Up to 50% of the purchase price shall, at the option of the General Partner, be paid in unregistered Shares. The General Partner shall have 30 days in which to accept such offer.

* * * * * * *

XV. LIABILITY OF THE GENERAL PARTNER

15.1. <u>Return of Capital Contribution</u>. Anything in this Agreement to the contrary notwithstanding, the General Partner shall not be individually liable for the return of the Capital Contributions of the Limited Partners, or any portion thereof, it being expressly understood that any such return shall be made solely from Partnership assets.

15.2.  <u>Exculpation and Indemnification</u>.  The doing of any act or the failure to do any act by the General Partner shall not subject the General Partner to any liability to the Partnership or the Partners, except for gross negligence or willful malfeasance.  The Partnership shall indemnify the General Partner against losses sustained in connection with the Partnership, provided that the losses were not the result of gross negligence, self-dealing or willful malfeasance on the part of the General Partner.

      *    *    *    *    *    *    *

16.5.  <u>Amendments</u>.  Amendments to this Agreement may be proposed by the General Partner or Limited Partners with a Limited Partnership Percentage in excess of 50%.

      *    *    *    *    *    *    *

16.5.2.  In addition to any amendments otherwise authorized herein, the General Partner may, without obtaining the consent of the Limited Partners, amend this Agreement from time to time:

>   (a)  To add to the representations, duties or obligations of the General Partner or its affiliates or surrender any right or power granted to the General Partner or its affiliates herein, for the benefit of the Limited Partners; and

>   (b)  To cure any ambiguity, to correct or supplement any provision herein * * * which may be inconsistent with any other provision herein, or to make any other provisions with respect to matters or questions arising under this Agreement * * * as the case may be, which will not be inconsistent with the provisions of this Agreement * * *, provided that the Partnership receives a written opinion of independent counsel that such amendment does not adversely [a]ffect the interests of the Limited Partners.

>       *    *    *    *    *    *    *

>   (e)  Upon advice of counsel that the operations of the Partnership are in violation of law, to cause this Agreement to comply with law; provided, however, such amendments shall not alter materially the economic objectives of the

Partnership and, further, provided that any amendment to or deletion of any provision shall not in the opinion of the General Partners materially reduce the economic return to the Limited Partners.

The Management Contract With SCA Management

Pursuant to the provisions of paragraph 12 of the General Partnership agreement, supra, and paragraph 7.3 of the Operating Partnership agreement, supra, on April 30, 1990, the Operating Partnership entered into a contract with SCA Management, whereby SCA Management was retained "for the purpose of rendering management, administration and purchasing services and support, and all other management support needed for operation and, in the best interest, of the [Surgery] Center". The management agreement is signed on behalf of both the Operating Partnership and SCA Management by David E. Crockett, in his capacities as secretary and vice president, respectively, of these two entities.

Pursuant to the management contract, SCA Management has wide-ranging authority for operational management of the Surgery Center, except that it has "no power or authority to make any decision relating to the care or treatment of patients or other medical matters", this power and authority being specifically reserved to the Operating Partnership's Medical Advisory

Committee.[7]  SCA Management is authorized to enter into contracts

relating to the affairs of the Surgery Center, subject to certain

exceptions, requiring express authorization of the Operating

Partnership.  These exceptions include lease or contractual

obligations requiring payments in excess of $50,000 in any 12-

month period, and obligations to a related party in excess of

$5,000.

The management contract states that SCA Management is

authorized to provide services to the Operating Partnership

(referred to as "the Owner" in the following quoted provisions),

as follows:

## II.  MANAGEMENT SERVICES

1.    Subject to the provisions of Article I, the
Manager will render all services, direction, advice,
supervision and assistance in the operation of the Center,
as necessary, including, but not in any way limited to, the
following:

A.    Maintaining the accreditation of the Center
with the proper agencies and insurance companies;

B.    Arranging for the purchase by the Owner of
hazard, liability, professional and other necessary
insurance coverage for the Center; provided, however,
that the physicians practicing in the Center shall
obtain their own malpractice insurance;

C.    Employing, supervising, directing, leasing and
discharging on behalf of the Owner, all non-physician
personnel performing services at the Center, including

---

[7] Under paragraph 9.6 of the Operating Partnership
agreement, the general partner (i.e., the General Partnership)
determines what are medical standards and policies.

the administrator of the Center, as needed.  The administrator shall be subject to the Owner's approval.

D.  Negotiating fee payment methods, including Medicare reimbursement, with the appropriate third party payers and state and federal agencies;

E.  Establishing staffing schedules, wage structures and personnel policies for all personnel;

F.  Determining and setting patient charges for services provided by the Center, excluding charges for physicians' services, and arranging for payment of such charges by others, when appropriate;

G. Providing administrative policies and non-medical operating procedures to all departments;

H.  Providing standard formats for all charts, invoices and other forms used in the operation of the Center;

I.  Providing for the purchase or lease by the Owner of all supplies and equipment used in the operation of the Center;

J.  Directing the day-to-day operations of the Center to insure the operations are conducted in a business-like manner;

K.  Developing an ongoing advertising and promotion program;

L.  Negotiating or retaining on behalf of the Owner contractual relationships for anesthesiology, radiology and pathology services, as appropriate; and

M.  Performing all management and non-medical oversight responsibilities for the Owner.

2.  All costs and expenses incurred with respect to the services specified in Paragraph 1 above will be borne by the Manager.

III.  ACCOUNTING AND BOOKKEEPING SERVICES

1.  The Manager agrees to review, direct and supervise the following accounting and bookkeeping services for the Owner in the operation of the Center.

A.   Receipt for and deposit in a special bank account selected by the Owner, separate from all other monies of the Manager, all funds received from the operation of the Center and supervise the disbursement of such funds for the operating expenses of the Center;

B.   Maintain the books of account, including all journals and ledgers, check register and payroll records;

C. Post all patient and other charges, including necessary analysis and corrections;

D.   Establish adequate receivable, credit and collection policies and procedures;

E.   Process vendor's invoices and other accounts payable;

F.   Prepare payroll checks from time sheet summaries prepared under the Manager's supervision;

G.   Prepare payroll and supervise preparation of the Owner's tax returns (fees paid to independent accountants will be the responsibility of the Owner);

H.   Prepare monthly bank reconciliations;

I.   Prepare and distribute to the Owner monthly profit and loss statements;

J.   Establish patient insurance billing procedures;

K.   Furnish the Owner on or before the 30th day following the end of each calendar quarter (i) an accrual basis balance sheet of the Owner at the end of the previous quarter and (ii) an accrual basis statement of income for the quarter then ended of "available cash" at the end of such quarter and (iii) a list of all outstanding and unpaid obligations of the Owner at the end of such quarter. * * *

L.   Furnish the Owner for its approval, during the fourth quarter of each fiscal year, the operating budget and capital expenditure budget of the Center for the next fiscal year.

Under the management contract, SCA Management is entitled to receive a monthly management fee equal to 6 percent of gross revenues, defined as the net collectable portion of revenues billed as fees or other charges arising out of the operation of the Surgery Center, with no deduction for bad debts. In addition, SCA Management is entitled to be reimbursed for direct expenses incurred in managing the Surgery Center. The Operating Partnership is required to approve any single expense in excess of $5,000.

The term of the management contract is equal "to the term of any indebtedness, lease or other obligation of the * * * [Operating Partnership] guaranteed by SCA or an affiliate of SCA but not less than 15 years." The management agreement is renewable by SCA Management at its option for two 5-year terms. Except for circumstances involving bankruptcy or insolvency, the management contract is terminable by the Operating Partnership only if SCA Management breaches the agreement, and then generally only after a 90-day notice and 90-day cure period.

Managing Directors of the General Partnership

As indicated in paragraph 4 of the General Partnership agreement, supra, overall management of the General Partnership, except for questions of medical standards and medical policies, is vested in its managing directors, consisting of four persons, two of whom are appointed by petitioner, and two of whom are

appointed by SCA Centers.  The managing directors of the General Partnership meet on a quarterly basis.  Their activities and responsibilities include:

    a.    Developing and approving the Surgery Center's capital and operating budgets;

    b.    Approving distributions of the Surgery Center's earnings;

    c.    Hiring and firing the Surgery Center's manager;

    d.    Reviewing the Surgery Center's financial results;

    e.    Reviewing proposed capital equipment purchases of the Surgery Center;

    f.    Appointing one-half of the members of the Surgery Center Medical Advisory Committee;

    g.    Facilitating the lending of equipment from Redlands Hospital to the Surgery Center;

    h.    Reviewing the Surgery Center's use of nursing staff;

    i.    Coordinating training and mentoring opportunities between Redlands Hospital and the Surgery Center;

    j.    Approving any long-term debt obligations;

    k.    Approving any obligations for repairs, equipment, additions, or betterments to the Surgery Center;

    l.    Approving any lease or contractual obligations requiring payments in excess of $50,000 in the aggregate for

any twelve-month period or those obligations not in the ordinary course of business; and

m.    Approving any obligation to a related party in excess of $5,000.

Quality Assurance Agreement

Paragraph 13 of the General Partnership agreement, supra, requires SCA Management to enter into a quality assurance agreement with RHS whereby RHS will agree to perform "certain managerial and supervisory quality assurance duties" in connection with the operation of the Surgery Center.  The General Partnership agreement provides that the quality assurance agreement is to continue from year to year unless terminated by either of the parties.

Effective April 30, 1990, SCA Management and RHS entered into a quality assurance agreement.  The agreement states that SCA Management "retains RHS for the purpose of the management and supervision of quality assurance programs for the [Surgery] Center and [to] oversee its affairs, and for providing additional services as SCA [Management] may reasonably request."

The quality assurance agreement recites as one of its premises that SCA Management "desires to reimburse RHS for certain services, including without limitation management and the supervision of quality assurance programs with respect to the [Surgery] Center."  Under the quality assurance agreement, RHS

was to receive no fee during the first year and thereafter was to be paid a monthly fee equal to 1 percent of gross revenues.  In addition, SCA Management was to reimburse RHS for its direct out-of-pocket expenses incurred in managing and supervising the quality assurance program.  The quality assurance agreement states that RHS' appointees as managing directors shall not receive any compensation from SCA Management, but that SCA Management shall reimburse them for all reasonable travel expenses and out-of-pocket expenses.

On September 30, 1990, RHS transferred its obligations and rights under the Quality Assurance Agreement to petitioner.

By its terms, the quality assurance agreement was to continue from year to year unless terminated by either SCA Management or petitioner.  The quality assurance agreement was to terminate automatically, however, if the number of surgical cases performed at the Surgery Center was less than 4,225 during any year.  The agreement states that if it is terminated for any reason, the parties agree to negotiate in good faith an agreement on substantially the same terms.

Medical Advisory Group

Pursuant to paragraph 9.6 of the Operating Partnership agreement, supra, all questions regarding medical standards and policies at the Surgery Center are determined by a Medical Advisory Group, which also reviews procedures being performed at

the Surgery Center. The Medical Advisory Group is composed of six physicians who are all limited partners of the Operating Partnership. The managing directors of the General Partnership select three members of the medical advisory group; Beaver Medical Clinic--which is a limited partner in the Operating Partnership--selects the other three members. Prior to the affiliation of the General Partnership with the Surgery Center, the Medical Advisory Group was inactive.

## Redlands Surgical Services (Petitioner)

On August 1, 1990, 5 months after entering into the General Partnership agreement, RHS incorporated petitioner as a California nonprofit public benefit corporation. On September 30, 1990, RHS transferred its interest in the General Partnership to petitioner.

RHS formed petitioner with the intent that petitioner's sole planned activity would be its efforts with respect to the Operating Partnership. The decisions to incorporate petitioner as a separate corporate entity and to transfer the interests in the General Partnership to petitioner were made to protect Redlands Hospital and Redlands Foundation from potential creditors of the Surgery Center and to keep petitioner's and the Surgery Center's activities free of the debt covenants of Redlands Hospital.

Petitioner's articles of incorporation state in relevant

part:

ONE: The name of this Corporation is REDLANDS SURGICAL SERVICES.

TWO: This Corporation is a nonprofit public benefit corporation and is not organized for the private gain of any person. It is organized under the Nonprofit Public Benefit Corporation Law for charitable purposes. The corporation is organized solely for the benefit of, and to carry out the charitable purposes as stated in the respective Articles of Incorporation of (a) RHS Corp., a California nonprofit corporation, (b) Redlands Community Hospital, a California nonprofit Corporation, and (c) Redlands Community Hospital Foundation, a California nonprofit corporation.

\* \* \* \* \* \* \*

FOUR: (a) The property of this corporation is irrevocably dedicated to charitable purposes, and no part of the net income or assets of this corporation shall ever inure to the benefit of any director, officer or member of this corporation, or to the benefit of any private individual.

\* \* \* \* \* \* \*

FIVE: (a) This corporation is organized exclusively for charitable purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code. Notwithstanding any other provisions of these Articles, the corporation shall not carry on any activities not permitted to be carried on (i) by a corporation exempt from Federal income tax under Section 501(c)(3) of the Internal Revenue Code of 1954, as amended (or the corresponding provision of any future United States Internal Revenue Law or (ii) by a corporation, contributions to which are deductible under Section 170(c)(2) of the Internal Revenue Code of 1954, as amended (or the corresponding provision of any future United States Internal Revenue Law).

Petitioner's bylaws limit membership to one member.  The sole member is RHS, which has the right to elect, remove, and fill vacancies in petitioner's Board of Directors.  Petitioner's bylaws provide that the directors must be among those persons serving as members of the Enterprise Committee of petitioner's parent corporation RHS.

Petitioner's sole source of financial support is its share of the revenues from the Operating Partnership.  Petitioner has no paid or salaried employees.  The president of Redlands Hospital serves concurrently as petitioner's president.

## The Surgery Center's Operations

The Surgery Center operates on a nondiscriminatory basis both as to doctors and patients.  There are no restrictions as to whether a surgical patient can be operated on at the Surgery Center, other than a review as to the appropriateness of conducting the surgical procedure in an outpatient setting and the overall medical condition of the patient.  There is practically a 100-percent overlap between surgeons who operate at Redlands Hospital and at the Surgery Center.

Between 1990 and 1995, the number of surgical procedures performed at the Surgery Center increased 10 percent.  Over the same period, the number of outpatient surgeries performed at Redlands Hospital decreased from 2,239 to 1,864.[8]

---

[8] The administrative record does not reflect the number of

(continued...)

<u>Procedures Authorized To Be Performed at the Surgery Center</u>

The General Partnership agreement specifies the types of medical services and procedures to be available at the Surgery Center, which include:  Arthroscopic surgeries, laproscopic surgeries (including hysterectomies and appendectomies), conizations, tonsillectomies, herniorrhaphy and eye surgeries. When such procedures involve a higher-risk patient, they are performed at Redlands Hospital or another acute-care hospital. The decision to perform surgery at a hospital rather than at the Surgery Center is exclusively a medical decision.

The General Partnership agreement generally provides that, unless otherwise approved by the managing directors, the Surgery Center will not perform new surgical procedures until they are available on a nonhospital, outpatient basis at a majority of freestanding outpatient surgery facilities in the area.  If the managing directors deadlock over approval of new procedures, the arbitration provisions of the partnership agreement do not apply to break the deadlock.

Petitioner's appointees to the managing directors have successfully blocked various proposals by SCA Centers that additional surgical procedures be conducted at the Surgery Center.  For example:

---

[8](...continued)
outpatient surgical procedures performed at the Surgery Center or Redlands Hospital since 1995.

-- SCA Centers requested that Redlands Hospital transfer all of its outpatient surgery volume to the Surgery Center. Petitioner's appointees to the managing directors, however, did not feel that this was an appropriate use of the facility nor in the best interests of Redlands Hospital and voted against this proposal. As a result, outpatient surgeries continue to be performed at Redlands Hospital.

-- SCA Centers proposed that the Surgery Center offer new surgical procedures that would require the patient to stay overnight to recover. Petitioner's representatives did not think this was an appropriate service to offer at the Surgery Center and voted against performing these procedures at the Surgery Center. As a result, surgical procedures that require 24-hour recovery time are performed at a hospital.

-- SCA Centers proposed that physicians be permitted to perform retinal attachments at the Surgery Center and requested that the Surgery Center purchase the necessary equipment for the surgical procedure. Petitioner did not believe there was sufficient volume in the Redlands patient community to maintain quality control over this type of surgery, and so its two appointees to the managing directors voted against the purchase of the equipment and the

performance of this type of eye surgery at the Surgery Center.

In addition, petitioner's appointees to the board of directors voted against SCA Center's proposal to bill on behalf of Redlands Hospital for outpatient surgeries performed there.

Payment for Services

The Surgery Center's charges are determined on the basis of customary and usual charges for similar services provided by other organizations in the area. The Surgery Center offers no free care to indigents and has no emergency room or certification to treat the emergency patient population. For persons who are unable to pay, an effort is made to provide all necessary services and to assist the patient in qualifying for appropriate medical coverage including Medi-Cal. The Surgery Center also provides payment plans for patients to make payment for procedures more affordable.

Since the General Partnership acquired its interest in the Operating Partnership, the Surgery Center has accepted more managed care (i.e., care provided by health maintenance organizations (HMO's)). Prior to April 1990, the Surgery Center had HMO contracts with 7 HMO's and preferred provider organizations (PPO's). As of April 1994, the Surgery Center had contracts with 21 HMO's and PPO's. For the last 6 months of 1993, managed care (i.e., care provided by HMO's and PPO's)

accounted for almost half of the Surgery Center's total facility invoices. The General Partnership agreement states that Redlands Hospital agrees to recognize the Surgery Center as an affiliate for managed care services to the extent legally permissible.

For the last 6 months of 1993, Medicare accounted for about 12 percent of total Surgery Center invoices. Because greater medical risks attend surgery of older patients, such as the typical Medicare patient, most Medicare surgeries are performed in a hospital setting, rather than in a surgery center.

Medicaid reimbursements are substantially below those provided by Medicare. Medi-Cal is the State of California's Medicaid program under Federal law. The California Medi-Cal patient group consists, in large part, of indigents, mothers, and children. These patients' greatest needs are for emergency room and obstetrics and gynecology (OB/GYN) medical service. As a result, this group of patients is more likely to avail themselves of the emergency room facilities at Redlands Hospital rather than either Redlands Hospital's or the Surgery Center's surgical facilities.

The Surgery Center has no contract with Medi-Cal directly, although a negligible amount of Medi-Cal coverage is provided for surgeries performed at the Surgery Center pursuant to participating hospital agreements between Redlands Hospital and the Blue Cross of California Medi-Cal Managed Care Program, effective December 1, 1994, and between Redlands Hospital and

PacifiCare of California, a California HMO, effective June 1, 1994. For the last 6 months of 1993, the Surgery Center's Medicaid invoices totaled 18, or less than 1 percent (8/10 of 1 percent) of all its invoices.

Integration of the Activities of Redlands Hospital and the Surgery Center

Since its affiliation with the General Partnership, the Surgery Center has served as a training site for Redlands Hospital nurses in outpatient procedures. Redlands Hospital nursing surgery staff members train at the Surgery Center in circumstances where the frequency of a particular surgery at the Surgery Center makes such training more efficient and economical. This is especially true of procedures that are more often performed at the Surgery Center than at Redlands Hospital (e.g., tonsillectomy and cataract surgeries).

To be a member of the Redlands Hospital physician staff, a physician must be board-certified in his or her specialty and regarded by Redlands Hospital as a capable practitioner. Redlands Hospital uses a "proctory" review process to approve new members of its physician staff. Before the General Partnership acquired its interest in the Surgery Center, no proctoring was conducted at the Surgery Center. Since the affiliation of the Surgery Center with the General Partnership, it is frequently the case that, as new surgeons join Redlands Hospital's staff, the

Redlands Hospital proctoring requirements are satisfied, in whole or in part, during surgeries performed at the Surgery Center.

Redlands Hospital has been involved in teaching new procedures to be performed at the Surgery Center. An example is laser arthroscopic surgery, which eliminates incision. These procedures were developed at Redlands Hospital, and the knowledge was shared with the Surgery Center.

The Surgery Center's Financial Results

The Surgery Center's profit levels and payor mix are comparable to other ambulatory surgery centers. Its profits are used for equipment additions, replacements, improvements in services, and cash distributions to the partners.

In the first 5-month period after April 30, 1990, when the amended Operating Partnership and the SCA Management contract became effective, the Operating Partnership had net income of $451,430, which was 34.5 percent of gross revenues. SCA Management received $80,458 in fees.

Cash distributions from the Operating Partnership to petitioner, SCA Centers, and the limited partners, expressed as an average rate of return on investment basis for fiscal years 1990-1993, were as follows:

Average Rates of Return

| | FY90 | FY91 | FY92 | FY93 | FY90-FY93 |
|---|---|---|---|---|---|
| Petitioner | 6.3% | 24.9% | 34.9% | 43.5% | 27.4% |
| SCA Centers | 4.4% | 17.3% | 25.4% | 31.5% | 19.6% |
| Limited Partners | 5.1% | 21.4% | 31.0% | 38.5% | 24.0% |

Upon its Form 1023, Application for Recognition of Exemption, under section 501(c)(3), filed August 7, 1990, petitioner estimated that between 50 and 80 percent of its total annual income would be used to support RHS and Redlands Hospital, which were stated to have total annual losses of $340,544 and $460,595, respectively. Petitioner has used its share of the cash distributions from the Operating Partnership to pay off the note payable to SCA for its initial capital contribution[9] and to make distributions to RHS or Redlands Hospital.

Final Adverse Ruling

In its final adverse ruling, respondent determined that petitioner is "not operated exclusively for charitable purposes within the meaning of section 501(c)(3). You are operating for a substantial nonexempt purpose and your operations benefit private interests more than incidentally."

---

[9] The note payable to SCA of $769,829 was paid in full by April 1992.

Petitioner has exhausted its administrative remedies within the Internal Revenue Service.

## OPINION

### I. The Parties' Positions

Respondent contends that petitioner is not operated exclusively for charitable purposes because it operates for the benefit of private parties and fails to benefit a broad cross-section of the community. In support of its position, respondent contends that the partnership agreements and related management contract are structured to give for-profit interests control over the Surgery Center. Respondent contends that both before and after the General Partnership acquired an ownership interest in it, the Surgery Center was a successful profit-making business that never held itself out as a charity and never operated as a charitable health-care provider.

Petitioner argues that it meets the operational test under section 501(c)(3) because its activities with regard to the Surgery Center further its purpose of promoting health for the benefit of the Redlands community, by providing access to an ambulatory surgery center for all members of the community based upon medical need rather than ability to pay, and by integrating the outpatient services of Redlands Hospital and the Surgery Center. Petitioner argues that its dealings with the for-profit partners have been at arm's length, and that its influence over

the activities of the Surgery Center has been sufficient to further its charitable goals. Petitioner further contends that it qualifies for exemption because it is organized and operated to perform services that are integral to the exempt purposes of RHS, its tax-exempt parent, and Redlands Hospital, its tax-exempt affiliate.

## II. Applicable Legal Principles

### A. Operational Test

To qualify for exemption from Federal income tax, an organization must be "organized and operated exclusively for * * * charitable * * * purposes". Sec. 501(c)(3); see Church of Scientology v. Commissioner, 823 F.2d 1310, 1315 (9th Cir. 1987), affg. 83 T.C. 381 (1984).

The applicable regulations provide as follows:

> (c) Operational test--(1) Primary activities. An organization will be regarded as "operated exclusively" for one or more exempt purposes only if it engages primarily in activities which accomplish one or more of such exempt purposes specified in section 501(c)(3). An organization will not be so regarded if more than an insubstantial part of its activities is not in furtherance of an exempt purpose. [Sec. 1.501(c)(3)-1(c)(1), Income Tax Regs.]

The operational test focuses on the actual purposes the organization advances by means of its activities, rather than on the organization's statement of purpose or the nature of its activities. See American Campaign Academy v. Commissioner, 92 T.C. 1053, 1064 (1989); Goldsboro Art League, Inc. v.

Commissioner, 75 T.C. 337, 343 (1980); Aid to Artisans, Inc. v. Commissioner, 71 T.C. 202, 210-211 (1978).  To determine whether the operational test has been satisfied, we look beyond "the four corners of the organization's charter to discover 'the actual objects motivating the organization'".  American Campaign Academy v. Commissioner, supra at 1064.

Although an organization might be engaged in only a single activity, that single activity might be directed toward multiple purposes, both exempt and nonexempt.  If the nonexempt purpose is substantial in nature, the organization will not satisfy the operational test.  See KJ's Fund Raisers, Inc. v. Commissioner, 166 F.3d 1200 (2d Cir. 1998), affg. without published opinion T.C. Memo. 1997-424; Manning Association v. Commissioner, 93 T.C. 596, 603-605 (1989); American Campaign Academy v. Commissioner, supra at 1065; Copyright Clearance Ctr., Inc. v. Commissioner, 79 T.C. 793, 804 (1982).  "The presence of a single * * * [non-exempt] purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly * * * [exempt] purposes."  Better Bus. Bureau, Inc. v. United States, 326 U.S. 279, 283 (1945).

The fact that an organization engages in a trade or business is not conclusive of a substantial nonexempt purpose and does not, in and of itself, disqualify the organization from exemption under section 501(c)(3), provided the activity furthers or

accomplishes an exempt purpose.  See Federation Pharmacy Servs., Inc. v. Commissioner, 72 T.C. 687, 691 (1979), affd. 625 F.2d 804 (8th Cir. 1980); est of Hawaii v. Commissioner, 71 T.C. 1067, 1079 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); secs. 1.501(c)(3)-1(c)(1) and 1.501(c)(3)-1(e)(1), Income Tax Regs.

Whether an organization has a substantial nonexempt purpose is a question of fact to be resolved on the basis of all the evidence presented by the administrative record.  See B.S.W. Group, Inc. v. Commissioner, 70 T.C. 352, 357 (1978); see also Church by Mail, Inc. v. Commissioner, 765 F.2d 1387, 1390 (9th Cir. 1985), affg. T.C. Memo. 1984-349; est of Hawaii v. Commissioner, supra at 1079.  "Factors such as the particular manner in which an organization's activities are conducted, the commercial hue of those activities, and the existence and amount of annual or accumulated profits are relevant evidence of a forbidden predominant purpose."  B.S.W. Group, Inc. v. Commissioner, supra at 358.

The burden of proof is on petitioner to demonstrate, based on materials in the administrative record, that it is operated exclusively for exempt purposes and that it does not benefit private interests more than incidentally.  See Rule 217(c)(2)(A); Church of Scientology v. Commissioner, 823 F.2d at 1317; Florida Hosp. Trust Fund v. Commissioner, 103 T.C. 140, 146 (1994), affd.

71 F.3d 808 (11th Cir. 1996). For purposes of this proceeding, we assume that the facts as represented in the administrative record are true, although in the course of our review we may draw our own ultimate conclusions and inferences from the facts. See American Campaign Academy v. Commissioner, supra at 1063-1064; Houston Lawyer Referral Serv., Inc. v. Commissioner, 69 T.C. 570, 573-575 (1978).

B. Promotion of Health as a Charitable Purpose

Section 501(c)(3) specifies various qualifying exempt purposes, including "charitable" purposes. The term "charitable" is not defined in section 501(c)(3), but is used in its generally accepted legal sense. See Nationalist Movement v. Commissioner, 102 T.C. 558 (1994), affd. per curiam 37 F.3d 216 (5th Cir. 1994); sec. 1.501(c)(3)-1(d)(2), Income Tax Regs. In applying this standard, courts have looked to the law of charitable trusts. See Sound Health Association v. Commissioner, 71 T.C. 158, 177 (1978); see also Bob Jones Univ. v. United States, 461 U.S. 574, 588 n.12 (1983).

The promotion of health for the benefit of the community is a charitable purpose. See Eastern Ky. Welfare Rights Org. v. Simon, 506 F.2d 1278, 1288-1289 (D.C. Cir. 1974), vacated on other grounds 426 U.S. 26 (1976); Sound Health Association v. Commissioner, supra at 177-181; see also 2 Restatement, Trusts 2d, secs. 368, 372 (1959); 4A Scott & Fratcher, Law of Trusts,

secs. 368, 372 (4th ed. 1989).  As applied to determinations of qualification for tax exemption, the definition of the term "charitable" has not been static.  See Eastern Ky. Welfare Rights Org. v. Simon, supra at 1287-1290; Sound Health Association v. Commissioner, supra.  Suffice it to say that, in recognition of changes in the health-care industry, the standard no longer requires that "the care of indigent patients be the primary concern of the charitable hospital, as distinguished from the care of paying patients".  Sound Health Association v. Commissioner, supra at 180.  Rather, the standard reflects "a policy of insuring that adequate health care services are actually delivered to those in the community who need them."  Id. at 180-181.  Under this standard, health-care providers must meet a flexible community benefit test based upon a variety of indicia, one of which may be whether the organization provides free care to indigents.  Cf. id. at 184-185 (subsidized dues program was an indicium of charitable purposes).

To benefit the community, a charity must serve a sufficiently large and indefinite class; as a corollary to this rule, private interests must not benefit to any substantial degree.  See id. at 181.

C.  Proscription Against Benefiting Private Interests

An organization does not operate exclusively for exempt purposes if it operates for the benefit of private interests such

as designated individuals, the creator or his family,
shareholders of the organization, or persons controlled, directly
or indirectly, by such private interests. See sec. 1.501(c)(3)-
1(d)(1)(ii), Income Tax Regs. The private benefit proscription
inheres in the requirement that an organization operate
exclusively for exempt purposes.

As stated in American Campaign Academy v. Commissioner, 92
T.C. 1053, 1065-1066 (1989):

> When an organization operates for the benefit of
> private interests such as designated individuals, the
> creator or his family, shareholders of the
> organization, or persons controlled, directly or
> indirectly, by such private interests, the organization
> by definition does not operate exclusively for exempt
> purposes. Prohibited private benefits may include an
> "advantage; profit, fruit; privilege; gain; [or]
> interest." Occasional economic benefits flowing to
> persons as an incidental consequence of an organization
> pursuing exempt charitable purposes will not generally
> constitute prohibited private benefits. Thus, should
> * * * [the organization] be shown to benefit private
> interests, it will be deemed to further a nonexempt
> purpose under section 1.501(c)(3)-1(d)(1)(ii), Income
> Tax Regs. This nonexempt purpose will prevent [the
> organization] from operating primarily for exempt
> purposes absent a showing that no more than an
> insubstantial part of its activities further the
> private interests or any other nonexempt purposes.
> [Citations and fn. ref. omitted.]

The proscription against private benefit shares common
elements with, but is distinct from, the proscription against the
inurement of organizational earnings to private shareholders and
individuals, as contained in section 501(c)(3) and sections
1.501(a)-1(c) and 1.501(c)(3)-1(c)(2), Income Tax Regs. See

American Campaign Academy v. Commissioner, supra at 1068.  The proscription against private benefit encompasses not only benefits conferred on insiders having a personal and private interest in the organization, but also benefits conferred on unrelated or disinterested persons.  See id.; Christian Stewardship Assistance, Inc. v. Commissioner, 70 T.C. 1037 (1978).

The mere fact that an organization seeking exemption enters into a partnership agreement with private parties that receive returns on their capital investments does not establish that the organization has impermissibly conferred private benefit.  The question remains whether the organization has a substantial nonexempt purpose whereby it serves private interests.  Compare Plumstead Theatre Socy., Inc. v. Commissioner, 675 F.2d 244 (9th Cir. 1982), affg. per curiam 74 T.C. 1324 (1980) (a nonprofit arts organization furthered its charitable purposes by participating as sole general partner in a partnership with private parties to produce a play), with Housing Pioneers, Inc. v. Commissioner, 49 F.3d 1395 (9th Cir. 1995), affg. T.C. Memo. 1993-120 (a nonprofit corporation's participation as co-general partner in low-income housing partnerships, structured to trade off its tax exemption to secure tax benefits for its for-profit partners, had a substantial nonexempt purpose and impermissibly served private interests).

The proscription against private benefit corresponds to a similar proscription in the law of charitable trusts. "A trust is not a charitable trust if the property or the income therefrom is to be devoted to a private use." 2 Restatement, Trusts 2d, sec. 376 (1959). An organization's property may be impermissibly devoted to a private use where private interests have control, directly or indirectly, over its assets, and thereby secure nonincidental private benefits.

For instance, in est of Hawaii v. Commissioner, 71 T.C. 1067 (1979), several for-profit 'est' organizations that had no formal structural control over the nonprofit entity in question nevertheless exerted "considerable control" over its activities. The for-profit organizations set fees that the nonprofit charged the public for training sessions, required the nonprofit to carry on certain types of educational activities, and provided management personnel paid for and responsible to one of the for-profits. Under a licensing agreement with the for-profits, the nonprofit was allowed to use certain intellectual property for 10 years, and at the end of the licensing agreement, all copyrighted material, including new material developed by the nonprofit, was required to be turned over to the for-profits. The nonprofit was required to use its excess funds for the development of 'est' or related research. The for-profits also required that trainers and local organizations sign an agreement not to compete with

'est' for 2 years after terminating their relationship with 'est' organizations.

In est of Hawaii v. Commissioner, supra at 1080, this Court agreed with respondent that the nonprofit was "part of a franchise system which is operated for private benefit and * * * its affiliation with this system taints it with a substantial commercial purpose."  We found that the "ultimate beneficiaries" of the nonprofit's activities were the for-profit corporations, and that the nonprofit "was simply the instrument to subsidize the for-profit corporations and not vice versa".  Id. at 1082. This Court held that the nonprofit was not operated exclusively for exempt purposes.  See also Harding Hosp., Inc. v. United States, 505 F.2d 1068 (6th Cir. 1974) (impermissible private benefit resulted from a nonprofit hospital's contract with a physician group, giving them a virtual monopoly over care of the hospital's patients and the income stream they represented, and providing the physician group with fees for supervising the hospital's medical staff); Sonora Community Hosp. v. Commissioner, 46 T.C. 519 (1966) (impermissible private benefit resulted from an arrangement whereby a for-profit laboratory was permitted to occupy space in the nonprofit hospital rent-free, and paid the hospital's founding doctors a share of the laboratory's gross revenues in consideration of patient referrals and administrative services), affd. 397 F.2d 814 (9th Cir. 1968).

III.  Petitioner's Claim to Exemption on a "Stand-Alone" Basis

Applying the principles described above, we next consider whether petitioner has established that respondent improperly denied it tax-exempt status as a section 501(c)(3) organization.

A.  The Relevance of Control--The Parties' Positions

Respondent asserts that petitioner has ceded effective control over its sole activity--participating as a co-general partner with for-profit parties in the partnerships that own and operate the Surgery Center--to the for-profit partners and the for-profit management company that is an affiliate of petitioner's co-general partner.  Respondent asserts that this arrangement is indicative of a substantial nonexempt purpose, whereby petitioner impermissibly benefits private interests.

Without conceding that private parties control its activities, petitioner challenges the premise that the ability to control its activities determines its purposes.  Petitioner argues that under the operational test, "the critical issue in determining whether an organization's purposes are noncharitable is not whether a for profit or not for profit entity has control. Rather, the critical issue is the sort of conduct in which the organization is actually engaged."  On brief, the parties agree that under an aggregate theory of partnership taxation, the partnerships' activities are considered petitioner's own

activities.  Petitioner's brief states:  "The evidence in the administrative file demonstrates that * * * [the Operating Partnership] has been operated in an exclusively charitable manner since 1990".  Therefore, petitioner concludes, it should be deemed to operate exclusively for charitable purposes.

We disagree with petitioner's thesis.  It is patently clear that the Operating Partnership, whatever charitable benefits it may produce, is not operated "in an exclusively charitable manner".  As stated by Justice Cardozo (then Justice of the New York Court of Appeals), in describing one of the "ancient principles" of charitable trusts, "It is only when income may be applied to the profit of the founders that business has a beginning and charity an end."  Butterworth v. Keeler, 219 N.Y. 446, 449-450, 114 N.E. 803, 804 (1916).  The Operating Partnership's income is, of course, applied to the profit of petitioner's co-general partner and the numerous limited partners.[10]  It is no answer to say that none of petitioner's income from this activity was applied to private interests, for the activity is indivisible, and no discrete part of the Operating Partnership's income-producing activities is severable

_____

[10] In making these observations, we are mindful that it is the status of petitioner, not of the General Partnership or the Operating Partnership, that is in issue.  Indeed, it is not meaningful to speak of a partnership's exempt status, given that partnerships are nontaxable entities.  See sec. 701.

from those activities that produce income to be applied to the other partners' profit.

Taken to its logical conclusion, petitioner's thesis would suggest that an organization whose main activity is passive participation in a for-profit health-service enterprise could thereby be deemed to be operating exclusively for charitable purposes. Such a conclusion, however, would be contrary to well-established principles of charitable trust law.

> Frequently, a business enterprise may have charitable effects. * * * A private hospital relieves sickness and suffering. * * * However, the primary object of these institutions is the pecuniary gain of the operators. Hence trusts to aid in the founding or maintenance of private hospitals or clinics * * *, which are business enterprises operated for the purpose of making profits for stockholders or owners, are not charitable even though they involve incidentally some public benefits. "It is not charity to aid a business enterprise." [Bogert & Bogert, The Law of Trusts and Trustees, sec. 364 (Rev. 2d ed. 1991) (quoting Butterworth v. Keeler, 219 N.Y. at 449, 114 N.E. at 804); fn. refs. omitted.]

Clearly, there is something in common between the structure of petitioner's sole activity and the nature of petitioner's purposes in engaging in it. An organization's purposes may be inferred from its manner of operations; its "activities provide a useful indicia of the organization's purpose or purposes." Living Faith, Inc. v. Commissioner, 950 F.2d 365, 372 (7th Cir. 1991), affg. T.C. Memo. 1990-484. The binding commitments that petitioner has entered into and that govern its participation in the partnerships are indicative of petitioner's purposes. To the

extent that petitioner cedes control over its sole activity to for-profit parties having an independent economic interest in the same activity and having no obligation to put charitable purposes ahead of profit-making objectives, petitioner cannot be assured that the partnerships will in fact be operated in furtherance of charitable purposes. In such a circumstance, we are led to the conclusion that petitioner is not operated exclusively for charitable purposes.

Based on the totality of factors described below, we conclude that petitioner has in fact ceded effective control of the partnerships' and the Surgery Center's activities to for-profit parties, conferring on them significant private benefits, and therefore is not operated exclusively for charitable purposes within the meaning of section 501(c)(3).

B.   Indicia of For-Profit Control Over the Partnerships' Activities

1.   No Charitable Obligation

Nothing in the General Partnership agreement, or in any of the other binding commitments relating to the operation of the Surgery Center, establishes any obligation that charitable purposes be put ahead of economic objectives in the Surgery Center's operations. The General Partnership agreement does not

expressly state any mutually agreed-upon charitable purpose or objective of the partnership.[11]

After the General Partnership acquired its 61-percent interest, the Operating Partnership--which had long operated as a successful for-profit enterprise and never held itself out as a charity--never changed its organizing documents to acknowledge a charitable purpose.  Indeed, in at least one instance the Operating Partnership agreement explicitly acknowledges the partnership's noncharitable objectives.  Section 16.5.2 of the Operating Partnership agreement, supra, in authorizing the General Partnership to amend the Operating Partnership as necessary to comply with legal requirements, specifies that this authority may be exercised only if "such amendments do not alter the economic objectives of the partnership or materially reduce the economic return to the limited partners."

---

[11] The prefatory "Whereas" clauses to the General Partnership agreement recite that RHS is entering into the agreement to "insure the availability of high quality health services in the most cost effective setting in which such services can be rendered" and because "the use of an ambulatory surgical center will contribute to RHS's goal of providing comprehensive health care services at an affordable price."  The partnership agreement, however, does not reflect that this was a mutual premise.  The partnership agreement states as the purpose of the partnership merely the acquiring of a 61-percent interest in the Operating Partnership, stating that the General Partnership "may engage in any and all other activities as may be necessary, incidental or convenient to carry out the business of the Partnership as contemplated by this Agreement."

2.  Petitioner's Lack of Formal Control

    a.  Managing Directors

Under the General Partnership agreement, control over all matters other than medical standards and policies is nominally divided equally between petitioner and SCA Centers, each appointing two representatives to serve as managing directors. (As discussed infra, matters of medical standards and policies are determined by the Medical Advisory Group, half of whom are chosen by the General Partnership's managing directors.) Consequently, petitioner may exert influence by blocking actions proposed to be taken by the managing directors, but it cannot initiate action without the consent of at least one of SCA Center's appointees to the managing directors.  For instance, petitioner lacks sufficient control unilaterally to cause the Surgery Center to respond to community needs for new health services, modify the delivery or cost structure of its present health services to serve the community better, or, as discussed in more detail infra, terminate SCA Management, if SCA Management were determined to be managing the Surgery Center in a manner inconsistent with charitable objectives.

The administrative record shows that petitioner has successfully blocked various proposals to expand the scope of activities performed at the Surgery Center.  Petitioner's ability to veto expansion of the scope of the Surgery Center's

activities, however, does not establish that petitioner has
effective control over the manner in which the Surgery Center
conducts activities within its predesignated sphere of
operations. Nor does it tend to indicate that the Surgery Center
is not operated to maximize profits with regard to those
activities. Indeed, given that all the partners except
petitioner are for-profit interests not shown to be motivated or
constrained by charitable objectives, and given that all the
limited partners except Beaver Medical Clinic were issued SCA
common stock when the General Partnership acquired its interest
in the Operating Partnership, and given that SCA Management
derives a management fee computed as a percentage of gross
revenues, we find, in the absence of evidence to the contrary,
that a significant profit-making objective is present in the
Surgery Center's operations. The high rates of return earned on
the partners' investments (including petitioner's) in the
Operating Partnership bolster this finding.

In sum, the composition of the managing directorship
evidences a lack of majority control by petitioner whereby it
might assure that the Surgery Center is operated for charitable
purposes.[12] Consequently, we look to the binding commitments

---

[12] The managing directors of the General Partnership are
functionally equivalent to a hospital's board of directors, the
importance of which has been described as follows:

(continued...)

made between petitioner and the other parties to ascertain whether other specific powers or rights conferred upon petitioner might mitigate or compensate for its lack of majority control.

b.   Arbitration Process

The General Partnership agreement provides for an arbitration process in the event that the managing directors of the General Partnership deadlock over a matter other than medical standards and medical policies, such as approval of new surgical procedures.  Under these provisions, in the event of a deadlock, each of the co-general partners selects one arbitrator, and these two arbitrators select a third.  The arbitrators have final authority to decide matters referred to them.  The ground rules for the arbitration process are minimal and provide petitioner no assurance that charitable objectives will govern the outcome. Under the General Partnership agreement, the arbitrators are not required to take into account any charitable or community benefit

---

[12](...continued)
        The board of directors, its composition, and its functions are relevant to tax exemption * * * the composition of the board provides important evidence that the hospital serves public rather than private purposes. For example, it is fair to presume that a board of directors chosen from the community would place the interests of the community above those of either the management or the medical staff of the hospital.  Thus, the relevance of the board is that its process should indicate whether the hospital is operated for the benefit of the community or to secure benefits for private interests.  [Mancino, "Income Tax Exemption of the Contemporary Nonprofit Hospital", 32 St. Louis U.L.J. 1015, 1051 (1988).]

objective, but are simply required to "apply the substantive law of California".

Petitioner asserts that since 1990, neither co-general partner has invoked the arbitration clause. The administrative record is inconclusive on this point. Even assuming arguendo that petitioner's assertion is correct, it merely tends to show that petitioner and SCA Centers have avoided conflict with regard to those operating decisions that are subject to arbitration. Whether such conflicts have been avoided because petitioner's purposes and the purposes of its for-profit partner are so closely aligned, or for some other reason, the administrative record does not reveal. Clearly, however, the arbitration process does not significantly mitigate petitioner's lack of majority control to provide any assurance that the General Partnership will operate to put charitable objectives ahead of economic objectives.

### c. The Management Contract

The management contract between the Operating Partnership and SCA Management confers broad powers on SCA Management to enter into contracts, to negotiate with third-party payers and State and Federal agencies, and to set patient charges for all services provided, with the exception of charges for physicians' services. In short, SCA Management is authorized to manage as it sees fit many of the day-to-day operations of the Surgery Center,

reserving to the Medical Advisory Group of the Operating Partnership the authority to make all medical decisions.

Under the management contract, SCA Management is entitled to receive fees equaling 6 percent of the Operating Partnership's gross revenues each month, in addition to reimbursement of its direct expenses.  This revenue-based compensation structure provides SCA Management an incentive to manage the Surgery Center so as to maximize profits.[13]

As a practical matter, the Operating Partnership is locked into the management agreement with SCA Management for at least 15 years.  At its sole discretion, SCA Management may renew the agreement for two additional 5-year periods on the same terms and conditions.  The Operating Partnership has the right to terminate the management contract for breach, but only after the Operating Partnership has given written notice describing in detail the

---

[13] The management contract defines gross revenues as "the net collectable portion of revenues billed as fees or other charges arising out of the operation of the [Surgery] Center, with no deduction for bad debts."  Petitioner suggests on brief that this means that SCA Management has no disincentive to treat patients who are unable to pay for treatment, because the "gross revenues" on which its management fee is based would include the chargeable amount for the services rendered.  We do not find these arguments convincing.  In the first instance, the Surgery Center does not provide charity care.  Moreover, petitioner's argument does not address to what extent charitable services, if they were provided, would give rise to "net collectable * * * revenues".  Nor does petitioner's argument address the broader point that the management contract gives SCA Management an economic interest to maximize revenues in all aspects of the Surgery Center's operations, and not just as relate to charity care.

basis on which it believes termination is justified. Because the issuance of such a termination notice would require approval by a majority of the General Partner's managing directors, petitioner could not effect the issuance of such a notice without the consent of SCA Centers, which is an affiliate of SCA Management. Thus, even if petitioner determined that SCA Management were managing the Surgery Center in a manner inconsistent with charitable purposes, petitioner could not be assured of any remedy.

Moreover, neither the General Partnership agreement, the Operating Partnership agreement, nor the management contract itself requires that SCA Management be guided by any charitable or community benefit, goal, policy, or objective. Rather, the management contract simply requires SCA Management to render services as necessary and in the best interest of the Operating Partnership, "subject to the policies established by [the Operating Partnership], which policies shall be consistent with applicable state and Federal law."

Petitioner argues that the management contract "was negotiated at arm's length, between parties of equal bargaining strength". The administrative record does not support this contention. Although the General Partnership agreement was negotiated between RHS and SCA Centers, it contains only a sparse description of several key features to be included in the

management contract.[14]  The actual management contract is between SCA Management and the Operating Partnership, and contains much more extensive and detailed provisions than are stipulated in the General Partnership agreement.  Notably, the term of the management agreement is at variance with the term stipulated in the General Partnership agreement.[15]

The administrative record does not reveal that petitioner or RHS had any role in negotiating the actual management contract. It is executed for both the Operating Partnership and SCA Management by the same individual--David E. Crockett--in his dual capacities as secretary of SCA Centers and vice president of SCA Management, raising the suggestion, if not the likelihood, of self-dealing between these two SCA affiliates.

Respondent asserts, and we agree, that this long-term management contract with an affiliate of SCA Centers is a salient indicator of petitioner's surrender of effective control over the

---

[14] The General Partnership agreement merely provides that SCA Management will assume "full responsibility for administering the day-to-day operation of the ambulatory center in accordance with the goals, policies and objectives" of the Operating Partnership, and stipulates an initial 15-year term, renewable for two 5-year terms, and a fee equal to 6 percent of the Operating Partnership's gross revenues.

[15] Whereas the General Partnership agreement stipulates a 15-year initial term for the management contract, the actual management contract modifies this provision to the advantage of SCA and its affiliates by providing that the initial term is equal to the term of any indebtedness, lease, or other obligation of the Operating Partnership guaranteed by SCA or SCA's affiliate, but not less than 15 years.

Surgery Center's operations to SCA affiliates, whereby the affiliates were given the ability and incentive to operate the Surgery Center so as to maximize profits.  This surrender of effective control reflects adversely on petitioner's own charitable purposes in contracting to have its sole activity managed in this fashion.  Cf. est of Hawaii v. Commissioner, 71 T.C. 1067 (1979).

> d.  Medical Advisory Group

The Operating Partnership agreement delegates authority for making decisions about care and treatment of patients and other medical matters to the Operating Partnership's Medical Advisory Group.  This group was inactive before the General Partnership became involved with the Operating Partnership, but there is no evidence to show what role, if any, petitioner played in reconstituting the Medical Advisory Group.

Only three of the six members of the Medical Advisory Group are selected by the General Partnership.  The other three are selected by one of the limited partners, Beaver Medical Clinic. It is telling that the Medical Advisory Group is composed entirely of limited partners of the Operating Partnership, all of whom (except Beaver Medical Clinic) received common stock in SCA when the General Partnership acquired its Operating Partnership interest.  Taking all these considerations into account, it is clear that petitioner lacks sufficient influence to determine the

resolution of any matter brought before the Medical Advisory Group.  Moreover, there is no evidence in the record that the decisions of the Medical Advisory Committee are subject to independent review by petitioner or Redlands Hospital.

e.  Termination of Quality Assurance Activities

As required by the General Partnership agreement, on April 30, 1990, SCA Management entered into a quality assurance agreement with RHS.  The term of the quality assurance agreement was conditioned on maintenance of a specified level of surgery activity in the Surgery Center.  Petitioner concedes that the quality assurance agreement terminated after the first year.[16] Although the agreement required the parties to negotiate a new quality assurance agreement in the event of such a termination, there is no evidence in the record that such negotiations ever occurred.[17]

The termination of the quality assurance agreement vividly evidences petitioner's lack of effective control over vital aspects of the Surgery Center's operations.  Quality assurance

---

[16] The termination of the quality assurance agreement is disclosed in petitioner's reply brief, filed on May 11, 1998. Petitioner's counsel represent that the fact of the termination of the quality assurance agreement was first disclosed to them on or about Apr. 30, 1998.

[17] Under the quality assurance agreement, petitioner was entitled to a fee equal to 1 percent of gross revenues, commencing in the second year.  Because the agreement terminated after the first year, it appears that petitioner never received any fees under the agreement.

agreements in the health-care industry serve the important dual functions of attempting to avoid inappropriate services (e.g., the wrong services for the patient's needs, or services that are improperly rendered), and seeking to assure that enough services are provided to meet the patient's needs. See 2 National Health Lawyers Association, Health Law Practice Guide, sec. 25.1, at 25-3 (1997). The record does not reflect that petitioner performed any quality assurance work. Likewise, the record is silent as to how petitioner, in the absence of any operable quality assurance agreement, purports to assure itself that these vital functions will be discharged consistently with charitable objectives.

    3.  Lack of Informal Control

The administrative record provides no basis for concluding that, in the absence of formal control, petitioner possesses significant informal control by which it exercises its influence with regard to the Surgery Center's activities. Nothing in the administrative record suggests that petitioner commands allegiance or loyalty of the SCA affiliates or of the limited partners to cause them to put charitable objectives ahead of their own economic objectives. Indeed, until April 1992, petitioner was in a debtor relationship to SCA. The limited partners (except for Beaver Medical Clinic, Inc.) all became common stockholders of SCA when the General Partnership acquired its interest in the Operating Partnership.

The administrative record does not establish that petitioner has the resources or ability effectively to oversee or monitor the Surgery Center's operations. Petitioner has almost no resources apart from its assets invested in the General Partnership. The president of Redlands Hospital also serves as petitioner's president and as one of the four managing directors of the General Partnership.

On brief, petitioner argues that its influence in the partnerships is evidenced by various changes that it says occurred in the operation of the Surgery Center after April 1990, when the amended Operating Partnership agreement became effective. Petitioner suggests that these operational changes demonstrate that its influence is sufficient to allow it to achieve its charitable goals through the partnerships' activities and demonstrate that for-profit interests do not control the partnerships and the Surgery Center. As described in more detail below, the record does not support petitioner's contentions.

a. Change in Criteria for Procedures Performed at the Surgery Center

Petitioner asserts that after the General Partnership acquired its interest in the Operating Partnership, "the decision to perform a surgery at the Surgery Center was changed from an economic to exclusively a medical decision. Accordingly, RHS achieved its goal of providing complete access to freestanding

ambulatory surgery center care for all members of the Redlands community irrespective of their ability to pay."

This proposed finding of fact is not supported by the record. Neither before nor after petitioner's involvement with it has the Surgery Center provided charity care. Moreover, the administrative record indicates that one aspect of ambulatory surgery centers that makes them attractive investment opportunities in the first instance is that they boast favorable "procedure and payer mixes".[18] Consequently, it is not apparent from the record to what extent the decision to perform a surgery at the Surgery Center has ever been an "economic" rather than a "medical" decision, or exactly how that situation might have changed after April 1990.

Even if we assume, arguendo, that a change in criteria did occur after April 1990, the record does not establish petitioner's role in effecting any such change.

---

[18] The administrative record includes an investment summary with respect to SCA and another national health-care provider, Medical Care International, published by Shearson Lehman Brothers, dated Aug. 7, 1991. The report states: "To a large extent the favorable payer mix is a function of the fact that many procedures safely performed on an outpatient basis happen to be those with a young patient population." Similarly, in its arguments to justify the Surgery Center's low rate of Medi-Cal patients, petitioner notes that the Surgery Center does not perform the types of procedures--emergency room treatments and obstetrics and gynecology--that typically account for a "substantial majority" of low-income surgical expenses for a community.

b.  Provision for Indigent Patients

Petitioner concedes that as of December 31, 1993, Medi-Cal patients accounted for only 0.8 percent of total procedures performed at the Surgery Center.  Petitioner argues that the type of services which the Service Center offers is not the type of services typically sought by low-income individuals.  Petitioner notes that Redlands Hospital has negotiated certain provider agreements that designate the Surgery Center as a subcontractor to provide outpatient services for Medi-Cal patients, and that Redlands Hospital has caused the Surgery Center to increase its number of managed care contracts.  Petitioner suggests that these efforts demonstrate petitioner's influence over the operations of the Surgery Center and evidence petitioner's charitable purposes.

We do not find petitioner's arguments convincing.  The facts remain that the Surgery Center provides no free care to indigents and only negligible coverage for Medi-Cal patients.  That low-income individuals may not typically seek the types of services the Surgery Center offers may partially explain the virtual absence of relief it provides for such individuals.  But it provides no independent basis for establishing petitioner's charitable purposes in its involvement with the Surgery Center.  Moreover, the activities of Redlands Hospital in effecting some negligible degree of Medi-Cal coverage at the Surgery Center and in increasing the number of managed care contracts do not provide

a basis for establishing petitioner's exemption.  Cf. <u>Harding</u>
<u>Hosp., Inc. v. United States</u>, 505 F.2d 1068 (6th Cir. 1974)
(activities performed by third parties did not provide a basis
for organization's exemption).

Petitioner asserts that the Surgery Center has no
requirement that patients demonstrate an ability to pay before
receiving treatment.  The record does not reflect whether any
such policy has been communicated to its patients.  Petitioner
suggests that this policy is evidenced by the Surgery Center's
"substantial Medicare" patronage.  The record shows that Medicare
accounted for 12 percent of invoices at the Surgery Center in the
last half of 1993.  The record does not reflect, however, whether
the Surgery Center waives fees in excess of those covered by
Medicare and accordingly does not establish that ability to pay
is not a factor even for patients covered by Medicare.  Moreover,
the Surgery Center's treatment of Medicare patients cannot on
this record be attributed to petitioner's influence over the
Surgery Center's operations.  According to the affidavit of Mr.
James R. Holmes, who was president of petitioner and Redlands
Hospital at the time of the affidavit, the Surgery Center "has
regularly treated Medicare patients * * * since before 1990."

c. <u>Coordination of Activities of Redlands Hospital and the Surgery Center</u>

In arguing that it plays an active role in the conduct of the Surgery Center's activities, petitioner cites a number of ways in which Redlands Hospital has integrated its activities with those of the Surgery Center since the General Partnership acquired its interest in the Operating Partnership. These include Redlands Hospital's use of the Surgery Center as a site for training and surgeon proctoring, as well as various other cooperative training and educational activities between Redlands Hospital and the Surgery Center.[19]

Although there may be cooperation between the Surgery Center and Redlands Hospital, nothing in the record suggests that these various cooperative activities are more than incidental to the for-profit orientation of the Surgery Center's activities. Cf. <u>Harding Hosp., Inc. v. United States</u>, <u>supra</u> at 1075-1076

---

[19] The administrative record contains unexplained inconsistencies regarding certain of these training procedures. On the one hand, a letter in the administrative record, dated Nov. 23, 1994, from Ernst & Young to respondent's representative, cites laproscopic cholecystectomy (gall bladder surgery) as an example of a new procedure that Redlands Hospital was extensively involved in teaching to physicians using the Surgery Center. On the other hand, an affidavit of Gary J. Cottingham, president of RHS and Redlands Hospital from Sept. 22, 1987, to May 12, 1995, states that SCA Centers requested that the Surgery Center begin to perform outpatient cholecystectomies at the Surgery Center, but that the General Partnership's managing directors rejected the proposal. Mr. Cottingham's affidavit states: "At least through May 1995, * * * Outpatient cholecystectomies were not performed at [the Surgery Center]."

(educational, training and community-oriented programs conducted at a hospital and funded by a third party were not sufficient to merit the hospital's tax exemption where other disqualifying factors were present).

C.    Competitive Restrictions and Market Advantages

By entering into the General Partnership agreement, RHS (petitioner's parent corporation and predecessor in interest in the General Partnership) not only acquired an interest in the Surgery Center, but also restricted its future ability to provide outpatient services at Redlands Hospital or elsewhere without the approval of its for-profit partner.  Paragraph 16 of the General Partnership agreement, supra, prohibits the co-general partners and their affiliates from owning, managing, or developing another freestanding outpatient surgery center within 20 miles of the Surgery Center, without the other partner's consent.  Moreover, Redlands Hospital may not "expand or promote its present outpatient surgery program within the Hospital."  In fact, outpatient surgeries performed at Redlands Hospital decreased about 17 percent from 1990 to 1995, while those performed at the Surgery Center increased.

The General Partnership agreement also restricts the parties and their affiliates from providing outpatient surgery services and procedures that the agreement does not specifically authorize to be provided at the Surgery Center (hereinafter referred to as

nonlisted services).  Under this agreement, Redlands Hospital,
but not the co-general partners or any of their other affiliates,
is allowed to perform nonlisted outpatient services that were
currently available to patients in California at the time the
General Partnership agreement was executed.  By contrast, neither
Redlands Hospital nor the co-general partners or their affiliates
are allowed to perform nonlisted outpatient services that first
become available in California during the term of the General
Partnership agreement (i.e., until March 31, 2020), unless the
managing directors of the General Partnership approve.[20]

Consequently, RHS effectively restricted its own ability to
assess and service community needs for outpatient services until
the year 2020.  It is difficult to conceive of a significant
charitable purpose that would be furthered by such a restriction.

The administrative record contains a market research report
on the ambulatory surgery center industry, prepared by Ernst &
Young and transmitted to Redlands Hospital on October 20, 1994.
This report describes the strong movement toward providing health
care services in ambulatory settings, driven both by economic
considerations and technological advances.[21]  The report notes

---

[20] As previously discussed, petitioner lacks sufficient
control to dictate any such approval by the managing directors,
and, in the event of deadlock, the matter would go to
arbitration.

[21] The report states that during the 1980's, hospital-based
(continued...)

that hospitals face "strong competition" in this market. It cites economic advantages that freestanding ambulatory surgery centers enjoy over hospitals. These advantages include, among other things, higher turn-over of operating rooms that increases the number of "fee-generating procedures" surgeons can do; lower nurse compensation that in turn leads to "higher margins"; and the "general tendency for private payers to account for a high percentage of a surgery center's mix, since most procedures performed in outpatient settings are elective (nonemergency) and are done on younger, non-Medicare patients." The report cites physician relations and capital as two major barriers to entering this market.

The Shearson Lehman Brothers investment summary, see supra note 18, contains similar facts and conclusions. The report indicates that SCA and Medical Care International are the two main surgical center chains, that they are highly profitable, and that their margins are likely to continue moving higher. The report notes that one reason for the high profitability of these chains is that "they typically shadow-price hospitals, which tend

_____

[21](...continued)
outpatient surgeries grew from 3 million in 1980 to 11 million in 1990, and that nonhospital-based surgery volume increased even faster, experiencing a 21.1-percent growth in procedures between 1989 and 1990 alone. The report projects continued growth in this industry, stating: "The expansion of ambulatory surgery service centers is likely to be accelerated by economic incentives * * * as well as new technological developments."

to charge very high rates for outpatient surgery so they can shift costs to the private sector and spread out their overhead." The report states that "one might expect hospitals to fight hard for this business by starting up their own FASCs [freestanding ambulatory surgery centers]", but that this had not happened to date because it is very hard for hospitals to do so, due partly to problems hospitals face in throwing off their own "culture" and creating an autonomous unit that is small, friendly, and efficient. The report states: "[SCA's] strategy of developing three-way joint ventures--consisting of a local hospital, surgeons, and the company--represents an attractive opportunity to address these cultural problems." The report notes:

> the FASC niche of the health care services industry has the further attraction of considerable consolidation opportunity. We believe that multispecialty, nonhospital FASCs currently number 600-700, with perhaps another 100 opening each year. Yet there are currently only two chains, Medical Care International and [SCA] affiliates, which have a total of 109 units. * * *

> Once a surgical group decides to sell its center, there is generally only one bidder (Medical Care or [SCA]), with the price typically five to seven times pretax income. * * * The key issue for MDs is not the modest amount of cash that comes from a sale but the operating environment for them once the center changes hands.

In the instant case, the Surgery Center had not one but two bidders, the General Partnership, offering four to five times earnings, and another unrelated, for-profit bidder, otherwise unidentified in the record, offering approximately six times

earnings.  A letter from Ernst & Young to respondent's representatives, dated July 14, 1992, indicates that the Surgery Center took the General Partnership's offer instead of the other, higher bid because of a desire to have an affiliation with Redlands Hospital for quality control and other reasons.

Viewed in its totality, the administrative record is clear that SCA and petitioner derive mutual economic benefits from the General Partnership agreement.  By borrowing necessary up-front capital from SCA, RHS (petitioner's predecessor in interest in the General Partnership), overcame a capital barrier to gain entry into a profitable and growing market niche.  By forming a partnership with RHS, SCA Centers was able to benefit from the established relationship between Redlands Hospital and the limited partner physicians to acquire its interest in the Surgery Center at a bargain price.

By virtue of this arrangement, petitioner and SCA Centers realized further mutual benefits by eliminating sources of potential competition for patients, as is evidenced by the restrictions on either party's providing future outpatient services outside the Surgery Center, and by Redlands Hospital's agreeing not to expand or promote its existing outpatient surgery facility at the hospital.  In light of the statement in the record that it is typical for national chains such as SCA to "shadow-price" hospitals in charging for services at outpatient

surgery centers, it seems most likely that one purpose and effect of the containment and contraction of Redlands Hospital's outpatient surgery activities is to eliminate a competitive constraint for setting Surgery Center fees (a matter delegated to SCA Management under the management contract, excluding charges for physicians' services).  Moreover, market consolidation provided petitioner and SCA Centers mutual advantages by eliminating pressures to compete in spending for expensive equipment.[22]

There is no per se proscription against a nonprofit organization's entering into contracts with private parties to further its charitable purposes on mutually beneficial terms, so long as the nonprofit organization does not thereby impermissibly serve private interests.  Cf. Plumstead Theatre Socy. v. Commissioner, 75 F.2d 244 (9th Cir. 1982); Broadway Theatre League v. United States, 293 F. Supp. 346 (W.D. Va. 1968).  In the instant case, however, RHS relied on the established relationship between Redlands Hospital and Redlands physicians to enable RHS and SCA affiliates jointly to gain foothold, on favorable terms, in the Redlands ambulatory surgery market. Then, by virtue of their effective control over the Surgery

---

[22] As stated in a letter in the administrative record written on behalf of petitioner from Ernst & Young LLP to respondent, dated Nov. 23, 1994, "The Hospital and * * * [the Surgery Center] also share surgical equipment so as to avoid a 'medical arms race' in the Redlands health care community."

Center, the SCA affiliates have been enabled to operate it as a profit-making business, with significantly reduced competitive pressures from Redlands Hospital, and largely unfettered by charitable objectives that might conflict with purely commercial objectives. Cf. est of Hawaii v. Commissioner, 71 T.C. 1067, 1080 (1979); Housing Pioneers, Inc. v. Commissioner, T.C. Memo. 1993-120, affd. 49 F.3d 1395 (9th Cir. 1995). The net result to the SCA affiliates is a nonincidental "advantage; profit; fruit; privilege; gain; [or] interest" that constitutes a prohibited private benefit. See American Campaign Academy v. Commissioner, 92 T.C. 1053, 1065 (1989).

D. Conclusion

Based on all the facts and circumstances, we hold that petitioner has not established that it operates exclusively for exempt purposes within the meaning of section 501(c)(3). In reaching this holding, we do not view any one factor as crucial, but we have considered these factors in their totality: The lack of any express or implied obligation of the for-profit interests involved in petitioner's sole activity to put charitable objectives ahead of noncharitable objectives; petitioner's lack of voting control over the General Partnership; petitioner's lack of other formal or informal control sufficient to ensure furtherance of charitable purposes; the long-term contract giving SCA Management control over day-to-day operations as well as a

profit-maximizing incentive; and the market advantages and competitive benefits secured by the SCA affiliates as the result of this arrangement with petitioner.  Taken in their totality, these factors compel the conclusion that by ceding effective control over its operations to for-profit parties, petitioner impermissibly serves private interests.

### IV.   Petitioner's Claim to Exemption Under the Integral Part Doctrine

Petitioner argues that even if it does not qualify for tax exemption on a "stand alone" basis, it qualifies for exemption under the integral part doctrine.

The integral part doctrine is not codified, but rather is the outgrowth of judicial opinions, rulings, and regulations. The precise contours of this doctrine are not clearly defined. The seminal case of Squire v. Students Book Corp., 191 F.2d 1018 (9th Cir. 1951), held that an organization that operated a bookstore on the premises of a college for the accommodation of students and faculty was exempt because it bore a "close and intimate relationship" to the functioning of the college itself. See also Brundage v. Commissioner, 54 T.C. 1468 (1970); Estate of Thayer v. Commissioner, 24 T.C. 384 (1955).

Shortly after the decision in Squire, Treasury regulations acknowledged the existence of the integral part doctrine in

providing an exception to the feeder organization rules under section 502.[23]

Section 1.502-1(b), Income Tax Regs., provides as follows:

(b) If a subsidiary organization of a tax-exempt organization would itself be exempt on the ground that its activities are an integral part of the exempt activities of the parent organization, its exemption will not be lost because, as a matter of accounting between the two organizations, the subsidiary derives a profit from its dealings with its parent organization, for example, a subsidiary organization which is operated for the sole purpose of furnishing electric power used by its parent organization, a tax-exempt educational organization, in carrying on its educational activities. However, the subsidiary organization is not exempt from tax if it is operated for the primary purpose of carrying on a trade or business which would be an unrelated trade or business (that is, unrelated to exempt activities) if regularly carried on by the parent organization. For example, if a subsidiary organization is operated primarily for the purpose of furnishing electric power to consumers other than its parent organization (and the parent's tax-exempt subsidiary organizations), it is not exempt since such business would be an unrelated trade or business if regularly carried on by the parent organization. Similarly, if the organization is owned by several unrelated exempt organizations, and is operated for the purpose of furnishing electric power to each of them, it is not exempt since such business would be an unrelated trade or business if regularly carried on by any one of the tax-exempt organizations. For purposes of this paragraph, organizations are related only if they consist of--

(1) A parent organization and one or more of its subsidiary organizations; or

---

[23] Although these regulations relate expressly to determining whether an organization is a feeder organization within the meaning of sec. 502 (an issue that respondent does not raise in the instant case), this Court previously has referred to these regulations in applying the integral part doctrine in the context of sec. 501(c)(3) exemptions. See Geisinger Health Plan v. Commissioner, 100 T.C. 394, 401 (1993), affd. 30 F.3d 494 (3d Cir. 1994).

(2)  Subsidiary organizations having a common parent organization.  An exempt organization is not related to another exempt organization merely because they both engage in the same type of exempt activities.

Since Squire, only a relatively small number of cases have applied the integral part doctrine.  These cases are fact-specific.  See Geisinger Health Plan v. Commissioner, 30 F.3d 494, 501 (3d Cir. 1994), affg. 100 T.C. 394 (1993), and cases cited therein.  As applied in a number of these cases, the integral part doctrine requires the organization in question to provide "necessary and indispensable" services solely to an exempt organization to which it bears some legal or significant operational relationship.  See, e.g., Hospital Bureau of Standards & Supplies, Inc. v. United States, 141 Ct. Cl. 91, 158 F. Supp. 560, 562 (1958) (recognizing exemption of an organization that provided "necessary and indispensable" product testing and purchasing of hospital supplies for its exempt member hospital); University Med. Resident Servs., P.C. v. Commissioner, T.C. Memo. 1996-251 (membership organizations that conducted clinical training programs for member universities were not exempt); Council for Bibliographic & Info. Techs. v. Commissioner, T.C. Memo. 1992-364 (recognizing exemption of an organization that conducted "necessary and indispensable" activities for exempt member libraries).  As applied in these cases, the integral part doctrine operates to recognize a

derivative exemption of an organization which serves only another exempt organization and performs essential services that the client organization otherwise would have performed for itself to accomplish its own exempt purposes.  See B.S.W. Group, Inc. v. Commissioner, 70 T.C. 352, 360 (1978); University Med. Resident Servs., P.C. v. Commissioner, supra, and cases cited therein.

Consistent with this rationale, professional group practices serving exempt entities have been granted tax exemption under the integral part doctrine.  See University of Mass. Med. Sch. Group Practice v. Commissioner, 74 T.C. 1299 (1980); B.H.W. Anesthesia Found., Inc. v. Commissioner, 72 T.C. 681 (1979); University of Md. Physicians, P.A. v. Commissioner, T.C. Memo. 1981-23.  These cases involved anesthesiology services or faculty medical activities that were provided solely to the served hospital or medical school and that were essential to the operation of the hospital or medical school.  See Geisinger Health Plan v. Commissioner, 100 T.C. 394 (1993).

In Geisinger Health Plan v. Commissioner, supra, this Court denied a claim for tax exemption asserted by an HMO under the integral part theory.  We reasoned that the group-practice line of cases was not controlling because, unlike the exempt organizations in those cases, the HMO had a population of subscribers that did not overlap substantially with the patients of the related exempt entities.  In considering whether the HMO'S

activities would have constituted an unrelated business if conducted by its affiliate, we noted that section 513(a) defines "unrelated trade or business" by reference to conduct that is "not substantially related" to the organization's exempt functions. We stated that the determination whether conduct is "substantially related" in this context "considers the degree to which income is earned from services rendered or sales made to persons who are not patients of the exempt affiliated entity." Id. at 405. Noting that entities related to the HMO provided 80 percent of the hospital services rendered to the HMO's patients, we held that the record in Geisinger did not justify a conclusion as to whether the instances in which the HMO's subscribers were served by unrelated entities were substantial or insubstantial. See id. at 406. Accordingly, we held that the HMO failed to establish that its activities comprised an integral part of its affiliate's exempt activities.

Similarly, in the instant case, petitioner has failed to establish that the Surgery Center's patient population overlaps substantially with that of Redlands Hospital. The record does not reveal what percentage of persons served at the Surgery Center are patients of Redlands Hospital. Clearly, however, the Surgery Center was performing ambulatory surgery on a for-profit basis for its own patients before petitioner was ever involved and presumably continued to do so afterward.

Even if we were to assume, arguendo, that the patient populations of the Surgery Center and Redlands Hospital overlap substantially, this circumstance would not suffice to confer exemption on petitioner under the integral part doctrine. In all the precedents cited above in which courts have applied the integral part doctrine to recognize a derivative exemption, the organization has been under the supervision or control of the exempt affiliate (or a group of exempt affiliates with common exempt purposes) or otherwise expressly limited in its purposes to advancing the interests of the affiliated exempt entity or entities, and serving no private interests.[24] For instance, in Squire v. Student Book Corp., 191 F.2d 1018, 1019 (9th Cir. 1951), all actions of the bookstore's board of trustees were submitted to the president of the college for approval, and the college comptroller acted as ex officio treasurer of the bookstore. The bookstore paid no rebates and no part of its earnings inured to private benefit. It seems clear that such considerations are central to the court's holding in Squire that

_____

[24] In Geisinger Health Plan v. Commissioner, 100 T.C. 394, 402 (1993), affd. 30 F.3d 494 (3d Cir. 1994), we stated that the parties had agreed that "an organization is entitled to exemption as an integral part of a tax-exempt affiliate if its activities are carried out under the supervision or control of an exempt organization and could be carried out by the exempt organization without constituting an unrelated trade or business" (emphasis added). In Geisinger, we made a factual finding that the affiliated exempt foundation controlled the HMO. See id. at 396.

the bookstore's business enterprise "bears a close and intimate relationship to the functioning of the College itself."[25]

By contrast, as previously discussed, petitioner's sole activity (the Surgery Center) is effectively controlled by for-profit parties. The operations of the Surgery Center plainly are not dedicated to advancing the interests of petitioner's exempt affiliates other than as those interests might happen to coincide with the commercial interests of petitioner's for-profit

---

[25] See also University of Mass. Med. Sch. Group Practice v. Commissioner, 74 T.C. 1299 (1980) (organization granted exemption was created pursuant to a special act of the State legislature as an integral part of the affiliated medical school and university hospital); B.H.W. Anesthesia Found., Inc. v. Commissioner, 72 T.C. 681, 683 (1979) (organization granted exemption was the incorporation of the affiliated hospital's department of anesthesiology, and most control rested directly or indirectly with the department's chairman); Brundage v. Commissioner, 54 T.C. 1468 (1970) (public museum that was determined to be an integral part of the City of San Francisco's city school system had previously been conveyed to the city); Estate of Thayer v. Commissioner, 24 T.C. 384 (1955) (alumni association's activities were for the purpose of advancing the affiliated public university, which held possession of, administered, and invested the association's endowment fund, with no moneys used for the benefit of any alumnus); University Med. Resident Servs., P.C. v. Commissioner, T.C. Memo. 1996-251 (organizations' memberships consisted entirely of nonprofit schools and affiliated teaching hospitals, representatives of which made all decisions about the organizations' activities); Council for Bibliographic & Info. Techs. v. Commissioner, T.C. Memo. 1992-364 (organization's membership consisted entirely of public and academic libraries, representatives of which comprised the organization's board of trustees); University of Md. Physicians, P.A. v. Commissioner, T.C. Memo. 1981-23 (the organization's articles limited its activities to serving the interests of the affiliated medical school and hospital, and petitioner could not be used to serve any private purpose of its stockholders); Hospital Bureau of Standards & Supplies, Inc. v. United States, 141 Ct. Cl. 91, 158 F. Supp. 560, 562 (1958) (organization's membership consisted entirely of nonprofit hospitals).

partners.  Moreover, as previously discussed, petitioner impermissibly serves private interests.  Petitioner's activity is not so substantially and closely related to the exempt purposes of its affiliates that these private interests may be disregarded.  See <u>Geisinger Health Plan v. Commissioner</u>, 100 T.C. at 406, 407.  Accordingly, petitioner is not entitled to exemption under the integral part doctrine.

Remaining contentions not addressed herein we deem irrelevant, without merit, or unnecessary to reach.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.



Redlands Health Systems, Inc. (RHS) [501(c)(3)]

Surgical Care Affiliates, Inc. (SCA) [For-Profit]

Redlands Community Hospital [501(c)(3)]

Petitioner: Redlands Surgical Services, Inc.

Redlands-SCA Surgery Centers (SCA Centers) [For-Profit]

SCA Management Co. [For-Profit]

2 Directors

2 Directors

46%

54%

Management Contract (at least 15 years renewable at SCA Management's option)

Redlands-ASC GP* (The General Partnership)

General Partner 59%

Inland Surgery Center, L.P. (The Operating Partnership)

Limited Partners 41%

Physicians & Beaver Medical Clinic, Inc.

*RHS entered into the General Partnership agreement on March 1, 1990. Petitioner succeeded to RHS's partnership interest on September 30, 1990.

**APPENDIX**